**NATIONAL BROADCASTING CO., Inc., et al. v. UNITED STATES et al.**

**COLUMBIA BROADCASTING SYSTEM, Inc., v. UNITED STATES (FEDERAL COMMUNICATIONS COMMISSION et al., Interveners).**

District Court, S. D. New York.

Nov. 16, 1942.

Charles R. Denny, of Washington, D. C., for the Commission.

Charles E. Hughes, Jr., of New York City, for Columbia Broadcasting System, Inc.

John T. Cahill, of New York City, for National Broadcasting Co., Inc.

Before L. HAND, Circuit Judge and GODDARD and BRIGHT, District Judges.

L. HAND, Circuit Judge.

These cases come before us a second time upon motions made by the defendants and the Mutual Broadcasting System—which has intervened—summarily ·to dismiss the complaints. The motions are made upon the complaints, upon certain affidavits of the counsel for the Commission, upon the Commission's report and all the proceedings and evidence before it, and—we shall assume—upon the affidavits filed by the plaintiffs on their motions for preliminary injunctions. We shall not repeat the outlines of the controversy as set forth in our opinion in 44 F.Supp. 688, and in that of the Supreme Court which reversed our judgments dismissing the complaints, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563, but shall proceed directly to consider the points raised.

The most important of these is whether the Commission had power to pass the challenged regulations. Everyone agrees that in granting licenses under § 309

of Title 47 U.S.C.A., it must distribute the available wave-lengths so as to give greatest possible service, and that it must see to it that all applicants have the necessary technical ability to broadcast programs, that the stations are properly constructed and properly manned and do not interfere with other stations, and that the licensees are responsible, morally and financially. All these things, and perhaps more, the Commission may regulate in discharge of its duty to promote the "public convenience, interest, or necessity." The regulations at bar have, however, nothing to do with these qualifications of a licensee; they are addressed, not to his ability to broadcast any programs which he may accept, but to his freedom to procure other programs than those to which by contract with, or by the control of, the "networks" he is limited; they touch, not how he shall broadcast, but how unrestricted he shall be in doing so. The plaintiffs say that, judged both by its history and by its language, the Act gave the Commission power to consider only the qualifications first specified, leaving outside any administrative control all arrangements by which a station secures its programs. They say that, although it is true that § 313 makes "all laws * * * relating to unlawful restraints * * * applicable to * * * interstate or foreign radio communications," and that the courts have jurisdiction in this way to annul monopolies or restrictive contracts which affect broadcasting, only courts may do so; the Commission must disregard any such considerations when deciding whether to grant or refuse a license.

Section 303 defines the Commission's powers; its original was § 4 of the Radio Act of 1927 which had eleven subdivisions, of which the first ten were the same as the first eleven of § 303 except for a new subdivision ("g") introduced into § 303. The eighth subdivision ("h") of § 4 of the Radio Act (now the ninth ("i") of § 303) gave the Commission "authority to make special regulations applicable to radio stations engaged in chain broadcasting;" and on it the Commission particularly relied. The plaintiffs answer that it was meant merely to give the Commission control over the power and wave-lengths used by stations while connected with "networks" for "chain broadcasting." It was introduced by an amendment in the Senate and originally read that the Commission should have power, "when stations are connected by wire for chain broadcasting," to "determine the power each station shall use and the wave lengths to be used during the time stations are so connected and so operated, and make all other regulations necessary in the interest of equitable radio service to the listeners in the communities or areas affected by chain broadcasting." The first clause of this amendment was indeed limited as the plaintiffs say; but the same was not true of the second clause. "Equitable radio service to the listeners" was a comprehensive phrase; read most naturally, it should include the best possible service compatible with such burdens as it was reasonable to impose upon the "networks" and their "affiliates"—"equitable," that is, in the sense that the interests of both sides were to be weighed. The fact that the occasion for the amendment appears to have been the Senate's apprehension that the "networks" might drown out "unaffiliated" stations, by no means circumscribed the scope of these words. This amendment finally emerged from Conference and was enacted, in the broad terms we have quoted; it would be altogether unwarranted to assume that it was intended to adopt the limited clause and to abandon the general one. We may start therefore with the strong probability that even in the Radio Act of 1927 the Commission had power by virtue of this subdivision to regulate "chain broadcasting" generally in the interest of "listeners."

The amendment to § 303 of the Communications Act of 1934, that is, the interpolation of subdivision "g," confirms this interpretation. That subdivision reads as follows: "Study new uses for radio, provide for experimental uses of frequencies, and generally encourage the larger and more effective use of radio in the public interest." We can see no reason for confining the last clause to scientific or engineering problems; the purpose is apparent to give the Commission power to foster the industry in all appropriate ways. It is not clear that this was a new purpose; but if it was, it infused the powers already granted in the earlier act, broadening them in accord with the changed outlook—the power granted under subdivision "i" among the rest. The duty—for the power imposed a corresponding duty—to "encourage" the "larger" use of radio incidentally presupposed a power to prevent the frustration of the purpose so disclosed; we are not to construe the section as at war with itself. Therefore, even if § 303 stood alone, we

should hold that subdivision "i" granted power to the Commission to consider the effect upon a station's choice of programs of any controls or restrictions exercised by the "networks."

■ However, § 303 does not stand alone. In addition to providing that all laws "relating to unlawful restraints and monopolies and to combinations, contracts, or agreements in restraint of trade" should apply to "radio communications," § 313 also took over from § 15 of the Act of 1927 the provision that in actions brought under those laws or in proceedings to enforce orders of the Federal Trade Commission, whenever "any licensee shall be found guilty of the violation of the provisions of such laws or any of them, the court, in addition to the penalties imposed by said laws, may * * * decree that the license of such licensee shall * * * be revoked." As will be observed, revocation was here made a penalty like other penalties for monopoly or restraint of trade; the courts were not to use it as a means of compelling a licensee to furnish service free from unlawful restrictions, but to punish him for his past misconduct, the discretion accorded them being exercised according to the degree of his "guilt." This was in harmony with the general scheme, for a court is not in good position to know how far a monopolistic or unfair competitive practice may interfere with "the larger and more effective use of radio in the public interest;" if any official was competent to do so, it was the Commission. Section 13 of the Radio Act of 1927 had provided that if a court revoked a license, the Commission must refuse to renew it, but it had stopped there; and, as the law then stood, it might perhaps have been argued with some show of plausibility that an applicant's monopolistic or unfair competitive practices in the past were not relevant to the grant of a license.

However that may have been, § 13 was amended in 1934 by adding a new clause, and the resultant § 311, in addition to retaining the old language forbidding the restoration of a forfeited license, contained a new one providing that the Commission is "authorized to refuse such station license" whenever the applicant had been "finally adjudged guilty" by a "Federal court of * * * attempting unlawfully to monopolize, radio communication * * * or to have been using unfair methods of competition." That power was certainly not to

be used as a punishment; the Commission was not to overrule the court which had decided not to impose the penalty. Such a power would have been open to serious constitutional objection. What use then was the Commission to make of an adjudication of the applicant's "guilt"? Only, we submit, by considering it as evidence that, if granted a license, he would not use it for the "public convenience, interest, or necessity," i. e. that the grant of a license would not "encourage the larger and more effective use of radio in the public interest." The necessary implication from this was that the Commission might infer from the fact that the applicant had in the past tried to monopolize radio, or had engaged in unfair methods of competition, that the disposition so manifested would continue and that if it did it would make him an unfit licensee. Thus, whatever may have been the limits of the Commission's earlier powers, manifestly after 1934 they included a consideration of how far licensees might be improperly restricted in the exploitation of their licenses.

■ The plaintiffs do not concede even this, as we understand it, but in any event they insist that the exercise of any such power was conditioned upon an earlier adjudication by some court. We can see no reason to suppose (although apparently the Commission does not agree) that an applicant's violation of the statutes against monopoly and unfair competition, as such and alone, ever disentitles him to a license. It is indeed evidence relevant to his fitness for the reasons we have just given; but it is such only as any past conduct may be an earnest of what is to be expected in the future, and because a repetition would be prejudicial to the public interest. We construe this clause of § 311 as going no further than to provide the Commission with an estoppel as to any facts which a court may have found; these may be taken as data for any rational inference that can be drawn from them relevant to the ultimate issue; but "guilt" as "guilt" is not the ultimate issue. Certainly that is the only effect which it is necessary to give the clause; there is not the slightest warrant for inferring that in the absence of an adjudication, the Commission may not determine what has been an applicant's past conduct, or may not consider how far, if repeated, it would interfere with the fullest use of his license. Whatever may be the mysteries enveloping an adjudication of

"guilt" under the Anti-Trust laws which make that issue unfit to be entrusted as such to profane hands, the Commission is certainly peculiarly competent to appraise the effect upon broadcasting of restrictive or monopolistic practices, and is as competent to decide whether an applicant is likely to engage in them as it is to decide any of the other issues which come before it. The decision in Federal Communications Commission v. Sanders Brothers Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869, is irrelevant; the only question decided was whether the injury suffered by an existing station was a material factor in licensing a new station.

■ The plaintiffs next challenge the regulations because they lay down general conditions for the grant of licenses instead of reserving decision until the issues arise upon an application. Such a doctrine would go far to destroy the power to make any regulations at all; nor can we see the advantage of preventing a general declaration of standards which, applied in one instance, would in any event become a precedent for the future. It may perhaps be true that a party, who had no notice of the hearings before the Commission and no opportunity to present his side, would be entitled, when applying for a license, to a reconsideration of those findings upon which the regulations rested. None of the plaintiffs at bar are in that position; they were amply advised of what the Commission proposed; they were invited to attend; all but the co-plaintiff "affiliates" of the National Broadcasting Company did so, put in whatever evidence they wished and were heard before the original regulations were passed, and again at the rehearing. They at any rate were accorded all the privileges they would have had if they had intervened in an application for a license. It would be futile after the expenditure of so much time and labor to hold that the proceedings were only advisory and concluded nobody; indeed, the mere fact that the regulations are "orders" reviewable under § 402(a) would seem to preclude such a conclusion. We do not understand the Supreme Court to mean that every minatory gesture of the Commission is reviewable under that section.

■ The next objection is that the Commission did not really find that the forbidden practices worked against the "public convenience, interest, or necessity," but that it rested upon its supposed duty to deny the applications of all who proposed to use their licenses in violation of the Anti-Trust laws. The Commission in one passage of its report does indeed seem so to have understood the statute, though it would scarcely be fair to say that it held as much; but, be that as it may, it did not base its action upon that theory. It made specific findings in the case of each regulation that the contract or the control which it forbade was against the public interest because it took away the stations' free choice without any corresponding advantage to the industry as a whole. Each regulation was a specific exercise of power, addressed to a particular practice which interfered with the most "effective use of radio in the public interest."

■ The only constitutional objections which we need consider are two: That the standard set by § 303 ("public convenience, interest, or necessity") is too vague; and that the regulations invade the privilege of free speech. Although the Supreme Court has twice at least upheld the standard when applied to the construction of stations or to the allocation of wave lengths (Federal Radio Commission v. Nelson Brothers Bond & Mortgage Co., 289 U.S. 266, 285, 53 S.Ct. 627, 77 L.Ed. 1166, 89 A.L.R. 406; Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 137, 138, 60 S.Ct. 437, 84 L.Ed. 656; (semble) Panama Refining Co. v. Ryan, 293 U.S. 388, 428, 55 S.Ct. 241, 79 L.Ed. 446), the plaintiffs insist that it will not serve if used to regulate the business arrangements of a station. We are assuming that when so used it demands the widest practicable variety in the choice of programs available for broadcasting; that system which will most stimulate and liberate the ingenuity of those who purvey them to the public. There can be no doubt that, if the introductory clause of § 303 will bear that construction the test is definite enough—and indeed peculiarly adapted to the putative proficiency of the Commission in its field. Nor can we see why, when applied to the issue of the licensee's freedom from restraint, the test is not a fair gloss to be imposed upon the clause. It is impossible in a single rubric to specify all the occasions to which it will apply, and the effort at specification is usually abortive for they cannot all be foreshadowed. It is enough if the delegated power be so defined that a

clue can be found in it for dealing with the several occasions which may arise. That seems to us to be the situation here.

■ The argument drawn from the First Amendment, as we understand it, is this. It is true that the regulations do not profess directly to control what programs the stations may broadcast; but they do so indirectly. They do this by forbidding them to make the forbidden contracts with "networks" even though they believe that these will bring them better programs than they can get in any other way; and it is not necessary for a law directly to control the substance of an utterance for it to invade the right of free speech. We agree that the regulations might be invalid though they do not prohibit programs on the basis of their contents; they do fetter the choice of the stations; absolutely free choice would include the privilege of deciding that they preferred the opportunities open to them under the "networks'" contracts to those which would be otherwise available. The Commission does therefore coerce their choice and their freedom; and perhaps, if the public interest in whose name this was done were other than the interest in free speech itself, we should have a problem under the First Amendment; we might have to say whether the interest protected, however vital, could stand against the constitutional right. But that is not the case. The interests which the regulations seek to protect are the very interests which the First Amendment itself protects, i. e. the interests, first, of the "listeners," next, of any licensees who may prefer to be freer of the "networks" than they are, and last, of any future competing "networks." Whether or not the conflict between these interests and those of the "networks" and their "affiliates" has been properly composed, no question of free speech can arise.

■ The last question upon the merits is whether the Commission's findings are so plainly without support in the evidence as to be "arbitrary or capricious," § 402(e); that is, whether the regulations are certain not to promote the "public convenience, interest, or necessity." A majority of the Commission, after a long and painstaking investigation, has concluded that the net result will be to give a larger choice to stations without sensibly diminishing the services of "chain broadcasting," which the report highly commended. We are asked to say that there is no reasonable basis for such a conclusion; to say that no reasonable person could find in the evidence any support for it. The industry at large holds conflicting views; the plaintiffs on the one hand believe that the prohibitions will in the end destroy "chain broadcasting" altogether; the Mutual Broadcasting System and a number of other interested persons think otherwise. Each side has stated its reasons and the Commission has chosen. It was created to make such choices because Congress believed that it would acquire in its special sphere a skill which courts could not match; and it is now hornbook law that the conclusions of such tribunals are not to be disturbed except in the plainest case. That doctrine applies here with especial force just because the findings are necessarily prospective; time alone can decide their success or their failure. The measure of our power is to say whether there was any substantial evidence that the added freedom given to stations will outweigh the reduction in the opportunities which will remain open to the "networks." We cannot say that there was no such evidence. To take the regulation which is the head and front of the Commission's offending—3.104—it indeed does limit the power of a "network" to furnish large advertisers with the time of all its "affiliates," for it must always run the risk that after its last inquiry a station may have "sold" to another "network" the time which it proposed to "buy" of that station. On the other hand, it is certainly possible that the present contracts give the "networks" so strong a hold upon the industry as to keep down competition which would prove beneficial. Upon such an issue nobody who is not steeped in the details of the business is really entitled to an opinion, and indeed even the opinions of those who are so steeped must be largely speculation. But that does not mean that the industry must be left to itself; the Commission was created precisely to say how far it was best to let things stand, and how far to intervene.

■ There remains only the question of procedure: Whether a motion for summary judgment is proper, or whether, as the plaintiffs argue, the causes should go to trial and be heard upon evidence taken de novo. That depends upon what effect we should give to the Commission's findings. If the plaintiffs intervened in a proceeding by one of their "affiliates" for the renewal of a license, they could not compel the Commission to reconsider the findings of

the report. As we have said, they had had adequate notice and full opportunity to be heard; indeed neither of the complaints alleges that they had not. Upon appeal to the Court of Appeals of the District of Columbia under § 402(b), the whole record before the Commission upon the hearings which resulted in the regulations would be part of the record, and the only issues open would be whether there was substantial support for the findings in the record, and whether the findings were "arbitrary or capricious," § 402(e). That record and those issues are before us here. The plaintiffs did not choose to wait and intervene, but adopted the alternative of an action in equity to "set aside" and "annul" the regulations as "orders." The reason that they have been allowed to proceed in this way is that the regulations inflicted a present injury upon them from which they were entitled to present relief; but the determining issues in each case are the same. Congress, having meant the validity of an order refusing a license to be determined as an appeal upon the record made before the Commission, cannot have meant to allow a larger scope of review because the Commission threatens for the same reasons to refuse all licenses.

This is confirmed by considering what use we could make of any evidence if we took it. It might go to show that the Commission had failed to give adequate notice to the plaintiff of what it proposed, or an adequate opportunity to put in their own evidence, or an adequate hearing upon all the evidence; but aside from the fact that the record is before us and does not bear out such a contention, neither complaint, as we have just said, alleges anything of the kind. On the other hand, if the evidence went to contradict or overthrow the findings, we could not bring it into hotchpot with the evidence taken by the Commission, without deciding the issues in the first instance ourselves. We have no such power; it would upset the whole underlying scheme of an expert commission, whose orders must stand or fall upon such evidence as it had before it. Tagg Bros. & Moorhead v. United States, 280 U.S. 420, 50 S. Ct. 220, 74 L.Ed. 524; Acker v. United States, 298 U.S. 426, 56 S.Ct. 824, 80 L.Ed. 1257. If an aggrieved party wishes to supplement that evidence he must apply to the Commission itself, § 405.

The plaintiffs somewhat faintly invoke the doctrine of Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598; Baltimore & Ohio Railroad Co. v. United States, 298 U.S. 349, 56 S.Ct. 797, 80 L.Ed. 1209, and St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033. Assuming that that doctrine is still law (Railroad Commission of Texas v. Rowan & Nichols Oil Co., 310 U.S. 573, 60 S.Ct. 1021, 84 L.Ed. 1368; Id., 311 U.S. 570, 61 S.Ct. 343, 85 L.Ed. 358), it does not apply. The "networks" are indubitably engaged in interstate commerce and so are their "affiliates;" it is a question of law, not of fact, whether the regulations are within the Commission's powers, and the only issue of fact, assuming it can be called such, is whether there was evidence to support the findings. Unless the distinction between what is jurisdictional and what goes to the exercise of a power is to disappear altogether, the Commission's jurisdiction did not depend upon whether they rightly estimated the "public convenience, interest, or necessity."

The complaints will be dismissed; and as there has been no trial, we need make no findings. As before, we will grant a stay, this time until February 1, 1943, or until the argument of the appeal in the Supreme Court, whichever is earlier. The same findings which we then made will serve with slight verbal changes. We are filing the judgments, the stays and findings along with this opinion.

Complaints dismissed.