**SPAULDING et al. v. DOUGLAS AIRCRAFT CO., Inc., et al.**

No. 11134.

Circuit Court of Appeals, Ninth Circuit.

March 13, 1946.

Rehearing Denied April 17, 1946.

Leo R. Friedman and Jos I. McMullen, both of San Francisco, Cal., for appellants.

John F. Sonnett, Asst. Atty. Gen., Walker Lowry and A. Morris Kobrick, Attys., Department of Justice, both of Washington, D. C., Charles H. Carr, U. S. Atty., and Ronald Walker and Robert E. Wright, Asst. U. S. Attys., all of Los Angeles, Cal., for appellees.

Before GARRECHT, DENMAN, and STEPHENS, Circuit Judges.

DENMAN, Circuit Judge.

This is an appeal from a judgment declaring that appellants, partner subcontractors selling airplane parts and material to appellee Douglas Aircraft Company, Inc., hereinafter called Douglas, a contractor furnishing to the United States war planes of which the appellants' materials were a part, are not entitled to payment to them of $27,580.80 due them from the contractor for such material sold it by the contractor between March 1, 1944, and July 1, 1944.[1]

The Secretary of War, acting under section 403(c) (1) of the Renegotiation Act[2] had determined that appellants had made in 1942 $110,000 in excessive profits, and the Secretary, pursuant to section 403(c) (2)[3] had directed the contractor to withhold such money from the appellants. Appellants brought their suit below to recover the money withheld by Douglas, alleging a controversy between them and Douglas as to the constitutionality of the Renegotiation Act and, incidentally, sought a declaratory judgment as to the Act's validity.

Section 403(b) (3) of the Act empowers the Secretary to require, in subcontracts for amounts in excess of $100,000, specific agreements of the subcontractors to renegotiate for the elimination of excessive profits. Section 403(c) (1), however, creates in the Secretary the power to renegotiate "any" contract for whatever amount, whether or not it contains the renegotiation clause. The appellants do not question that the Act provides for the renegotiation of excessive profits on subcontracts for material in amounts less than $100,000.

Douglas claims, and the court below held, that appellants by agreement had contracted that their subcontracts of 1942 were subject to the Secretary's excessive profits renegotiation and hence that they are estopped to assert the constitutionality of the renegotiation. The holding of the District Court is based upon correspondence between Douglas and appellants, in which it was thought it had been agreed by the appellants that in all their material contracts for whatever amount there he inserted the provision with respect to renegotiation which under section 403 (b) of the Act the Secretary could require in contracts in excess of $100,000. It is stipulated that no contract in 1942 was for an excess of $8,000. Appellants' letter of November 14, 1942, upon which appellees rely, reads:

"November 14, 1942
"Douglas Aircraft Company, Inc.

. . . . . .

"Subject: Renegotiation Clause
"Gentlemen:

"We have received your letter of September 14, 1942, on the subject of renegotiation.

"We hereby agree that Special Conditions 42 and 42A printed on the reverse side hereof shall be applicable to all purchase orders which you issue to us under Army and Navy contracts respectively; provided, however, that this agreement shall cover only purchase orders in which you are required by law or by contract to

---

[1] The United States intervened pursuant to 28 U.S.C. § 401, 28 U.S.C.A. § 401, and rule 24, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

[2] The Sixth Supplemental National Defense Appropriation Act, 1942, in section 403 (c) (1), as amended by Act Oct. 21, 1942, 56 Stat. 982, provides:

"(c) (1) Whenever, in the opinion of the Secretary of a Department, the profits realized or likely to be realized from any contract with such Department, or from any subcontract thereunder whether or not made by the contractor, may be excessive, the Secretary is authorized and directed to require the contractor or subcontractor to renegotiate the contract price * * *."

[3] "(2) Upon renegotiation, the Secretary is authorized and directed to eliminate any excessive profits under such contract or subcontract * * * (iii) by directing a contractor to withhold for the account of the United States, from amounts otherwise due to the subcontractor, any amount of such excessive profits under the subcontract; * * *." 50 U.S.C.A.Appendix § 1191(c) (1, 2).

insert such Special Conditions, and shall continue only so long as such requirement may be effective.

"Yours sincerely,

"Manlove & Spaulding Mfg. Co."

■ Since under section 403(b) (3) of the Act Douglas could be required to insert renegotiation provisions only in individual contracts in excess of $100,000, the letter is no agreement that these provisions are to be deemed a part of the 1942 contracts for the lesser amounts. Here was no such an agreement to waive a claim of unconstitutionality as in Pierce Oil Co. v. Phoenix Refining Co., 259 U.S. 125, 127, 42 S. Ct. 440, 66 L.Ed. 855.

■ It is further argued that from the mere fact that appellants bid on the 1942 contracts and had the bids accepted by the contractor to whom the war goods were sold, they are estopped to assert the unconstitutionality of the Act, since the profits in question are benefits flowing from the making of the contracts. The argument is that even if void because unconstitutional and hence no law at all (Ex parte Young, 209 U.S. 123, 159, 28 S.Ct. 441, 52 L.Ed. 714, 13 L.R.A.,N.S., 932, 14 Ann.Cas. 764), the void Renegotiation Act entered into and became a part of the proposal of the contractor and a part of the contract made by the acceptance of the subcontractors' bid.

We are unable to see how the making of the contract and its performance estops the subcontractor appellants from contending that it is not controlled by a statutory provision which, if unconstitutional, does not exist. The performance of the contract and claim for the amount due therefrom is in no way inconsistent with the contention that it is not subject to renegotiation.

The situation is entirely different from those in the estoppel cases relied upon by appellees. In each of these the party contending the unconstitutionality of the statutes involved had acted *affirmatively* to procure a benefit from such statutes. In Wall v. Parrott Silver & Copper Co., 244 U.S. 407, 411, 37 S.Ct. 609, 61 L.Ed. 1229, the parties were estopped because they had instituted a proceeding for the valuation of their stock, pursuant to statutes they also sought to have declared unconstitutional. In United Gas Co. v. Railroad Commission, 278 U.S. 300, 308, 49 S.Ct. 150, 152, 73 L.Ed. 390, after citing cases in which the parties sought to have declared unconstitutional

statutes whose benefits they had affirmatively invoked, the rule is stated: "* * * we think that appellants who have procured action by a state commission under a state statute may not assail that action in a federal court of equity on the ground that that statute, or the one creating the commission, is void under the State Constitution. Cf. Shepard v. Barron, 194 U.S. 553, 24 S.Ct. 737, 48 L.Ed. 1115. The sound discretion which controls the exercise of the extraordinary powers of a federal court of equity should not permit them to be exerted to relieve suitors on such a ground from the very action of state . authorities which they have invoked."

None of the cases presents the situation where one party is claiming to have performed a contract and ·the question is whether he is affected by a claimed unconstitutional provision which requires his further performance. We hold that appellants are not estopped to raise the question of constitutionality of the Renegotiation Act. Cf. Coffman v. Breeze, 323 U.S. 316, 324, 65 S.Ct. 298, 302. The sole question is, as they contend, are the provisions of the Act constitutional? If they are, appellants agree, the Secretary's withholding order is valid.

■ The Renegotiation Act became law on April 28, 1942. It was made applicable to existing contracts and subcontracts upon which it is an exercise of that same power to wage war which permits the government to control the price of every commodity bought and sold within the national boundaries (Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834); to fix the amount or rent to be charged for every room, home, or building and this even though to an individual landlord there may be less than a fair return (Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892); to construct extensive systems of public works (Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688); to operate railroads (Northern Pacific R. Co. v. North Dakota, 250 U.S. 135, 39 S.Ct. 502, 63 L.Ed. 897); to prohibit the sale of liquor (Hamilton v. Kentucky Distilleries Co., 251 U.S. 146, 40 S.Ct. 106, 64 L.Ed. 194); to restrict freedom of speech in a manner that would be unwarranted in time of peace (Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470); to ration and allocate the distribution of every commodity important to the war effort (Steuart & Bro. v.

Bowles, 322 U.S. 398, 64 S.Ct. 1097, 88 L. Ed. 1350); to restrict the personal freedom of American citizens by curfew orders and the designation of areas of exclusion (Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774); and, finally, to demand of every citizen that he serve in the armed forces of the nation (Falbo v. United States, 320 U.S. 549, 64 S.Ct. 346, 88 L.Ed. 305; Selective Draft Law Cases, 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349, L.R.A.1918C, 361, Ann.Cas. 856).

"The war power of the national government is 'the power to wage war successfully.' See Charles Evans Hughes, War Powers Under the Constitution, 42 A.B.A. Rep. 232, 238. It extends to every matter and activity so related to war as substantially to affect its conduct and progress. The power is not restricted to the winning of victories in the field and the repulse of enemy forces. It embraces every phase of the national defense, including the protection of war materials and the members of the armed forces from injury and from the dangers which attend the rise, prosecution and progress of war." Hirabayashi v. United States, 1943, 320 U.S. 81, 93, 63 S. Ct. 1375, 1382, 87 L.Ed. 1774.

During 1942, appellants manufactured and sold mechanical fittings and parts for airplanes, and the full capacity of appellants' plant was directed to the production of materials which had a war end use. Appellants' total sales for 1942 were approximately $405,000 and the profit on these sales, after payment of all expense except salaries to the partners, taxes and investments in the business, was $211,000, or a ratio of profit to sales of 52%. The Under Secretary reduced the profit to $100,000, making a ratio of profit to adjusted sales (total sales reduced by $110,000) of 33%.

Certainly it was a matter of congressional concern in a total war, global in extent, with the industry of the country straining to produce munitions, and in which our un-

preparedness on both the European and Asiatic fronts necessarily would create a profiteering "sellers' market," that profits of 52% were made on war materials for which the warring government must pay the price. It matters not from the standpoint of the Nation that the recapture of such profits for the war treasury is from a subcontractor supplying the material to the War Department through the ultimate delivery by the contractor, or that such war legislation is applicable to contracts made after the war-created demand exists but before the statute is enacted. Here, Congress in section 403(c) has limited the renegotiation to the excessive profits not yet realized in the payments of the contract price prior to the enactment of the legislation. Appellants, with the burden of proof, do not allege that any of the 1942 contracts from which the excessive profits were realized were entered into prior to its enactment.

Though in essence different from taxation, the power in war to recapture for the war treasury excessive profits from existing contracts is certainly as great as the power in peace to tax in a succeeding year the income earned prior to the tax legislation. There is no merit in appellants' contention that the agreement for the airplane parts is no more than an ordinary peace time contract between private parties.

■ The Secretary of War on June 30, 1942, by mandate delegated to the War Department Price Adjustment Board the power to establish the "policy, principles and procedure to be followed in renegotiation." That Board established standards for the determination of reasonable profits in war materials and services which were approved by the Under Secretary of War. Excessive profits are those in excess of reasonable profits. The factors in determining reasonable profits are those ordinarily considered by public regulatory bodies as modified by the unusual conditions created by the war demand.[4]

---

[4] Principles, Policy and Procedure to be Followed in Renegotiation, August 10, 1942, par. VII, reads:

"VII. Determination of Excessive Profits.

"Renegotiation in most instances will be confined to the determination of excessive profits, past and prospective, for the fiscal year of the company in which the renegotiation takes place. Companies will not be required to renegotiate for any fiscal year ending on or before December 31, 1941, except with the approval of the Board on each occasion.

"The Cost Analysis Sections will obtain, from other Government agencies and by use of statistical services or personal inquiry or investigation, the basic data for its fact-finding report on the profits, past and prospective, as shown by the records and estimates of the company. If questionnaires are used, they

Information concerning these standards was requested by the Senate Finance Committee in consideration of amendments to the Renegotiation Act with the bill for the Revenue Act of 1942, 26 U.S.C.A. Int.Rev. Acts, and a copy of the War Department's directive was furnished, likewise, to a subcommittee of that Committee. Since the directive was before the Congress in the consideration of the amendment to the Renegotiation Act, its passage on October 21, 1942, gives to the standards of the War De-

should be of a uniform type to be developed under the supervision of the Board.

"The Price Adjustment Sections will analyze the costs allocable to war production of the company, with a view to excluding improper or excessive charges including excessive salaries, bonuses and commissions; unreasonable maintenance and depreciation charges; improper amortization of war facilities or write-ups of property; unreasonable charges for research, development and experimental work; and unallowable advertising expenses. They will consider the propriety and amount of the reserves and extraordinary charges to income. They will review the estimates of prospective sales and costs in the light of information obtained from the War Department and based on experience with other companies.

"The Price Adjustment Sections will be guided in general by the following principles of renegotiation established by the War Department Price Adjustment Board:

"A company is entitled to no more than a reasonable wartime margin of profit. Ordinarily this is taken as the ratio of profit before taxes to sales or to costs or to net worth at the beginning of the year. Under existing war conditions more reliance should be placed on the ratio of profit to sales or to adjusted costs, and the ratio of profit to net worth should be used only as a check. In determining what percentage would be fair, consideration should be given to the corresponding profits in pre-war years for the particular company and for the industry especially in cases were the war products are substantially like the pre-war products, but it cannot be assumed that under war conditions a company requires as great a margin of profit as under competitive conditions in normal times; to the corresponding percentage allowed to other companies manufacturing similar war products or operating under similar conditions; and to the volume of sales, the allowable percentage being reduced on a graduated scale as the volume increases. Consideration should also be given to the ratio of labor and burden (overhead) to materials included in the adjusted costs since a company performing its own contracts requires a greater margin of protection than one which subcontracts most of the work,

and a company engaged in a complex manufacturing operation is entitled to more consideration than one engaged in a comparatively simple manufacturing operation. Consideration may also be given to the fact that a company has voluntarily made available to the Government its patent rights affecting war production.

"The margin of profit so determined should be adjusted, upward or downward, to reflect consideration of so-called factors of performance in respect of which the operations of the company compare favorably or unfavorably with those of other companies engaged in war production. Among these factors of performance are the following: (1) quality of production; (2) rate of delivery and turn-over; (3) inventive contribution; (4) cooperation with other manufacturers; (5) economy in use of raw materials; and (6) efficiency in reducing costs.

"The margin of profit so determined should also be adjusted upward to reflect consideration of risks attributable to war production which a company with fixed-price contracts must assume. Among these risks are the following: (1) increases in cost of materials; (2) imminent wage increases; (3) inexperience in new types of production; (4) complexity of manufacturing technique; and (5) delays from inability to obtain materials.

"In the case of a company with substantial capital devoted to war production, the ratio of the profit so determined to net worth at the beginning of the year should then be used as a check to determine whether the company is making a fair return on its investment. Net worth should be analyzed to determine to what extent it includes accumulated profits from war business. Furthermore, it cannot be assumed that under war conditions a company is entitled to as great a return as under competitive conditions in normal times.

"No attempt will be made to prescribe or even recommend actual percentages or ranges of percentages, for use in determining excessive profits. These percentages necessarily vary under all the circumstances and should be arrived at by the Price Adjustment Sections in discussions with representatives of companies engaged in the particular business under consideration."

partment's directives the same validity as was given the President's curfew regulations of March 2 and 16, 1942, in Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774. It is immaterial that in the Hirabayashi case the curfew order was by the Commander-in-Chief and in the instant case the directive was from the Secretary of War. The directive was the latter's function and "acting in cooperation, Congress and the Executive have constitutional authority to impose [the Renegotiation standards] here complained of." Hirabayashi v. United States, supra, 320 U.S. 91, 63 S.Ct. 1381, 87 L.Ed. 1774. Cf. United States v. Von Clemm, 2 Cir., 136 F.2d 968, certiorari denied 320 U.S. 769, 64 S.Ct. 81, 88 L.Ed. 459.

The parallel between this case and the Hirabayashi case is precise. Here as there a contention is made of delegation of legislative war-making powers. Here as there, action was taken by executive officers of the government which was said to be without proper congressional direction. Here as there, this executive action was brought to the attention of Congress and Congress thereafter passed a statute which constituted approval of the executive action. And accordingly, here as there, no question of delegation of legislative authority remains open. Whatever difficulties may be found in the original act, the amendments of October 21, 1942, merged the detailed administrative practice with the statute in a manner to foreclose all possibility of further doubt.

Appellants' only comment on this analogy is, "Clearly an emergency order given during the progress of war in an area of that war, an area threatened by enemy attack, is entirely different from recapture of profits by the government from private citizens who have contracted together." In our opinion, the intensity of the need for regulations, statutes and directives in a Nation's war-making is not the criterion. Since the war powers permit regulation for the war need, a lesser degree of such need does not place it outside the area of regulation.

■ Appellants contend that assuming the standards provided by the directive are to be deemed as part of the law, they nevertheless fail to satisfy the requirements of Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 246, 79 L.Ed. 446. In that case section 9(c) of the National Recovery Act empowered the President "to pass a prohibitory law" with respect to the amount of petroleum or petroleum products to be carried into interstate commerce. Under that law the amount so to be prohibited was that "produced or withdrawn from storage in excess of the amount permitted to be produced or withdrawn from storage by any State law or valid regulation or order prescribed thereunder, by any board, commission, officer, or other duly authorized agency of a State."

The President had no option as to the amounts of petroleum or its products which he was empowered to prohibit from entry into interstate and foreign commerce from any particular state. The Act bears the construction that he could prohibit such entry as to one or more or all the states, with its differing impact upon the total amount to be used in the national economy, with its effect upon prices and with its differing effect on the exhaustion of our diminishing national supply. Assuming it required the exclusion of all or none of the state determined excesses, the Supreme Court's view of the transaction is stated at page 415, of 293 U.S., 55 S.Ct. 246, 79 L.Ed. 446 as:

"* * * Section 9(c) does not state whether or in what circumstances or under what conditions the President is to prohibit the transportation of the amount of petroleum or petroleum products produced in excess of the state's permission. It establishes no criterion to govern the President's course. It does not require any finding by the President as a condition of his action. The Congress in section 9(c) thus declares no policy as to the transportation of the excess production. So far as this section is concerned, it gives to the President an unlimited authority to determine the policy and to lay down the prohibition, or not to lay it down, as he may see fit. And disobedience to his order is made a crime punishable by fine and imprisonment."

The Court further holds that no standard for the President's prohibiting action can be inferred from the declaration of policy of the National Industrial Recovery Act, 48 Stat. 195.

We do not agree that the Panama Refining case, without such declaration of policy or other standard of action, is comparable to the Renegotiation Act, with its "Principles, Policy and Procedure" established by the re-enactment of the Act, as we have held above. The standard of reasonable profits, above which are the excessive prof-

its to be recaptured, is that recognized as the basis of rates determined by the Interstate Commerce Commission, of which the Supreme Court states, at page 427 of 293 U.S., 55 S.Ct. 251, 79 L.Ed. 446, Panama Refining case, that a proper standard is "enforcing *reasonable* rates, in preventing *undue* preferences and *unjust* discriminations, in requiring *suitable* facilities for transportation * * *." (Emphasis supplied.) St. Louis I. M. & S. R. Co. v. Taylor, 210 U.S. 281, 287, 28 S.Ct. 616, 52 L. Ed. 1061; Intermountain Rate Cases, 234 U.S. 476, 486, 34 S.Ct. 986, 58 L.Ed. 1408; Avent v. United States, 266 U.S. 127, 130, 45 S.Ct. 34, 69 L.Ed. 202; New York Central Securities Corp. v. United States, 287 U.S. 12, 24, 25, 53 S.Ct. 45, 77 L.Ed. 138.

Congress properly has treated suppliers of war waging materials to a public engaged in a total war, as in peacetime it does such public service corporations as the power and light and railway companies. Appellants have had their individual hearing on the reasonableness of their profits, just as a power company has its reasonable profit determined in a hearing to fix its rates. It is not a case where unreasonableness of prices is to be determined by an individual at risk of criminal prosecution or having his transaction declared invalid as in United States v. L. Cohen Grocery Co., 255 U.S. 81, 41 S.Ct. 298, 65 L. Ed. 516, 14 A.L.R. 104, and Small v. American Sugar Co., 267 U.S. 233, 45 S.Ct. 295, 69 L.Ed. 589.

■ There is no merit to appellants' claim that the Renegotiation Act is unconstitutional because the taking of the excessive profits from a contract between two private parties impairs the contract's obligation. The Constitution does not deny to the Congress the right so to affect contracts if to accomplish purposes within its legislative power. As stated, here in a total war, Congress properly regulates the business of a supplier of munitions as rendering a public service analogous to that of the conventional public service bodies. Assuming the taking of the excessive profits affects the supplier's contract right to receive them, Congress has such power. Norman v. Baltimore & O. R. Co., 294 U.S. 240, 307, 308, 55 S.Ct. 407, 79 L.Ed. 885, 95 A.L.R. 1352; Home Building & Loan Ass'n v. Blaisdell, 290 U.S. 398, 434, 438, 54 S.Ct. 231, 78 L.Ed. 413, 88 A.L.R. 1481; Overnight Motor Co. v. Missel, 316 U.S. 572, 576, 62 S.Ct. 1216, 86 L.Ed. 1682.

■ Appellants further contend that the Renegotiation Act is invalid because providing for no findings of fact upon which is based the order determining excessive profits and that the order is invalid because lacking such findings, citing the Panama Refining case, supra, and Mahler v. Eby, 264 U.S. 32, 44, 44 S.Ct. 283, 68 L.Ed. 549. Since we regard the war power in renegotiation analogous to that of peacetime public utility agencies, a requirement in the Renegotiation Act for findings is not necessary. The ultimate fact as to the amount of excessive profits in the sum of $110,000 is found in the Secretary's order. Neither of these cases suggests that constitutionality requires findings of the probative facts from which the ultimate fact is determined. Nor is there merit in the contention that such a fact finding agency may consider facts not known to appellants. This wide area of consideration is not denied to the analogous rate making bodies.

■ Likewise there is no merit in the contention that in the exercise of such an administrative power the word "hearing" is not mentioned. The word "renegotiation" implies a hearing. Here there was a hearing and the absence of a statutory requirement is immaterial. Detroit Ry. v. Osborn, 189 U.S. 383, 391, 23 S.Ct. 540, 47 L.Ed. 860; cf. Steuart & Bro. v. Bowles, 322 U.S. 398, 401, 64 S.Ct. 1097, 88 L.Ed. 1350. Even if the renegotiation were deemed a unilateral proceeding, the Renegotiation Act was amended in section 701 of the Revenue Act of 1943 on February 25, 1944, 26 U.S.C.A. Int.Rev.Acts, by the addition of section 403(e) (2), providing that appellants could bring a proceeding in the Tax Court for a redetermination de novo of the amount, if any, of such profits under standards of determination provided in the amendment.

■ Though appellants, whose excessive profits had been determined by the Secretary on February 2, 1944, had ninety days from February 25, 1944, to seek such redetermination, they did not do so but instead, on August 11, 1944, filed the instant suit in the District Court. They are thereby in a position analogous to that of a taxpayer who has failed to initiate his proceeding for redetermination of a tax deficiency within ninety days after he has received the Commissioner's deficiency letter. As stated by the Supreme Court in Utley v. St. Petersburg, 292 U.S. 106, 109, 54 S.Ct. 593, 595, 78 L.Ed. 1155:

"This court will not listen to an objection that the charge has been laid in an arbitrary manner when an administrative remedy for the correction of defects or inequalities has been given by the statute and ignored by the objector." [5]

The 1944 amendment makes final and permits no appeal to the federal courts from the Tax Court's decision on the amount of excessive profits. The Tax Court proceedings have all the essentials of due process. Dobson v. Commissioner, 320 U.S. 489, 498, 64 S.Ct. 239, 88 L.Ed. 248. The Constitution does not require the Congress to give to any litigant a right of appeal. Assuming that the Tax Court is no more than an administrative body, the finality of its decisions as to the amount to be recaptured violates no constitutional right. Crane v. Hahlo, 258 U.S. 142, 147, 42 S.Ct. 214, 66 L.Ed. 514; Oceanic Steam Nav. Co. v. Stranahan, 214 U.S. 320, 336, 29 S.Ct. 671, 53 L.Ed. 1013; Passavant v. United States, 148 U.S. 214, 219, 13 S.Ct. 572, 37 L.Ed. 426; Hilton v. Merritt, 110 U.S. 97, 106, 3 S.Ct. 548, 28 L.Ed. 83.

The judgment of the District Court is affirmed.

---

[5] Milheim v. Moffatt Tunnel District, 262 U.S. 710, 724, 43 S.Ct. 694, 67 L. Ed. 1194; Abe Rafelson Co. v. Tugwell, 7 Cir., 79 F.2d 653, 655; Inghram v. Union Stock Yards Co., 8 Cir., 64 F.2d 390, 392; Walling v. Cohen, D.C., 48 F. Supp. 859, 863, affirmed 3 Cir., 140 F.2d 453; United States v. Piuma, D.C., 40 F.Supp. 119, 122, affirmed, 9 Cir., 126 F.2d 601, certiorari denied 317 U.S. 637, 63 S.Ct. 38, 87 L.Ed. 513.