**UNITED STATES v. POWNALL et al.**

No. 4771.

District Court, S. D. California, Central Division.

March 22, 1946.

148

Charles H. Carr, U. S. Atty., and Ronald Walker, and Robert E. Wright, Asst. U. S. Attys., all of Los Angeles, Cal., for plaintiff.

Leo R. Friedman and Jos. I. McMullen, both of San Francisco, Cal., for defendants.

YANKWICH, District Judge.

By its complant, the Government seeks to recover excess profits in the sum of $113,-709.19, with interest at the rate of six per cent per annum, from March 13, 1945, earned by the defendants on a war con-tract, as determined on December 27, 1944, by the War Contracts Price Adjustment Board under the Renegotiation Act of 1942 (Public Law 753, 77th Congress, 2nd session, Title VIII; 50 U.S.C.A.Appendix § 1191), as amended and reenacted by the Revenue Act of 1943 (Public Law 235, 78th Congress, 2nd session, Sec. 701; 50 U.S.C.A.Appendix § 1191). The determination is now final.

Actually the computed excess profit is $628,373.14. The amount which it is sought to recover is arrived at by deducting the sum of $514,663.95, as a tax credit, on the assumption that it was returned by the defendants as income for tax purposes and that taxes have been or will be paid on it.

The facts back of the controversy are un-disputed. The only issue is one of law, arising from the defendants' attack on the constitutionality of the Renegotiation Acts. Each side has made motions for judgment on the pleadings, or, in the alternative, for summary judgment. However, at my sug-gestion, the facts were stipulated in open court, in order that an adjudication might be made on the merits.

The Renegotiation Act of 1942 and the re-enactment of 1943 are both challenged as involving unlawful delegation of legis-lative power, as violative of due process—because of their alleged vagueness, indefi-niteness, and retroactive character—and as unconstitutional interferences with pri-vate contracts.

A thorough study of the questions thus presented in extensive briefs before sub-mission, and after the oral argument and submission, has led me to the conclusion that none of the grounds urged for the in-firmity of either statute is valid.

The opinion of the Ninth Circuit Court of Appeals in Spaulding v. Douglas Air-craft Co., Inc., 154 F.2d 419, filed after the submission of this cause, passes on and re-jects most of the contentions in this case.[1] That opinion and the fact that I have rec-ently had occasion to discuss very fully the war powers of the Congress in Gray v. Commodity Credit Corporation, D.C.Cal. 1945, 63 F.Supp. 386, make it unnecessary to state, with any degree of elaboration, the grounds for the conclusion reached here.

[1] I realize, of course, that in a matter of such importance, a rehearing will be asked, and if denied, petition for writ of certiorari to the Supreme Court will be made. However, I am so satisfied with the correctness of the views ex-pressed in the Circuit Court's opinion that I do not choose to delay the de-cision in this case until that opinion be-comes final.

More, an attempt to cover the grounds covered by the Circuit Court's opinion would be useless. For that opinion must control me. Any additional reasons might, perhaps, be justified by pride of authorship. In the face of so recent a decision of the higher court, its exercise now would not be in good taste.

However, certain issues particular to this case call for comment.

■ In this, as in other cases which deal with the exercise of legislative power in war time, one can make a rather plausible argument by disregarding realities. This was attempted in Gray v. Commodity Credit Corporation, supra, and also here. And it was done by applying to war-time legislation constitutional norms which obtain only in peace time, and by considering war contracts as private contracts unrelated to governmental war activities. This cannot be done. It is quite true, as a general proposition, that the Constitution governs in time of crisis or war, as well as in time of peace. Ex parte Milligan, 1866, 4 Wall. 2, 71 U.S. 2, 18 L.Ed. 281; Home Building & Loan Association v. Blaisdell, 1934, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413, 88 A. L.R. 1481.

■ However, restrictions on personal and property rights are sustained in time of war which would not be given judicial sanction in peace time. See, Hirabayachi v. United States, 1943, 320 U.S. 81, 93, 63 S.Ct. 1375, 87 L.Ed. 1774; Toyosaburo Korematsu v. United States, 1944, 323 U.S. 214, 65 S.Ct. 193; Bowles v. Willingham, 1944, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892; Yakus v. United States, 1944, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834; Steuart & Bros. v. Bowles, 1944, 322 U.S. 398, 64 S.Ct. 1097, 88 L.Ed. 1350; and see my opinion in Gray v. Commodity Credit Corporation, D.C.Cal. 1945, 63 F.Supp. 386, 394, 395, and cases in Notes 1, 2, 10, 12 and 19. It is true that the defendants were subcontractors, and did not deal directly with the Government. But the money which came to them from the prime contractor—the money used in constructing the implements of war for which the defendants manufactured parts (automatic screw products, including assembly rings, prongs and sockets)—had its source in the Treasury of the United States. It was public money voted by the Congress. And it is inconceivable that the Congress, which declared war and provided the means for conducting it successfully, should not be able, *in the exercise of its unlimited power to wage war*, to declare that excessive profits made by a subcontractor, be returned to the Government, through an administrative procedure for renegotiation, *aiming to determine whether the profits were excessive*.

■ The immensity of the Government's effort in this war and the variety of contractual relations between it and private industry which manufactured the weapons of war led to modification of some accepted concepts. Thus, for instance, section 35 of the Criminal Code, 18 U.S.C.A. § 82, which prohibited larceny of personal property of the United States or of any corporation in which the United States was a stockholder, was amended in 1938, § 35(c), 18 U.S.C.A. § 82—which, although not a war year, was a year of crisis—to include "any property which has been or is being made, manufactured, or constructed, under contract for the War or Navy Departments of the United States." As the law stood before the amendment, only property which was in *the complete ownership* of the United States or of a corporation in which the United States was a stockholder, was made the subject of the offense. By the amendment, the offense was extended to cover objects in the process of manufacture. Or, differently put, the original statute dealt with *completed objects* owned by the United States. The amendment included *uncompleted objects* in the process of manufacture for the United States. In a prosecution before me, under the amended section, I held that it covered not only a finished product, but also materials held available for its construction. United States v. Anderson, D.C.Calif., 1942, 47 F.Supp. 943. The aim of the Congress, of course, is apparent. As many implements of war, airplanes, tanks and the like, were being manufactured by private industry under contract for the War and Navy Departments, the Congress sought to protect from theft the property interest of the Government in the implements being manufactured and the materials which went into their construction. This for the obvious reason that the Government, either through fixed-price or cost-plus contracts, was paying for them. The right of the Government to defend by a penal statute its property even in inchoate form cannot be questioned.

Resort to penal sanction is indicative of the new approach which periods of crisis or war force the legislative branch of the

Government—an approach which, admittedly, was unknown to the older or common law concepts of property. In the absence of direct legislative command, courts, even in times of peace, have sought to protect the moneys of the United States when contributed to a joint enterprise. And this despite the fact that the project, when the Government helped finance, *became, upon its completion, the property not of the Government*, but of the other party to the joint venture. In pursuit of this policy, courts have followed money contributed by the Government to a joint project with state public agencies, in order to fasten responsibility for fraudulent acts in conjunction with contracts entered into between the state agency and private individuals, which were paid for *only partly* with government funds. See, United States ex rel. Marcus v. Hess, 1943, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443. We might well apply to the situation here the language of Mr. Justice Black in the case just cited:

*"Government money is as truly expended whether by checks drawn directly against the Treasury to the ultimate recipient or by grants in aid to states."* United States ex rel. Marcus v. Hess, supra, 317 U.S. at page 544, 63 S.Ct. at page 384, 87 L.Ed. 443. (Emphasis added)

Change the phrase *"grants in aid to states"* to *"payments to prime contractors,"* and the identity of the situation is clearly revealed. Money paid by the United States Government to a contractor, a portion of which flows down to a subcontractor, is as much an expenditure of government money as money expended by states under grants in aid to them.

▉ The impact of the last war was so sudden as to find us unprepared industrially. Our entire industrial machinery had to be geared to a war tempo. Of necessity, it was headed by men who had devoted their manufacturing skills to peacetime goods, and who were not in a position to estimate accurately the manufacturing costs of war products. Neither was the Government. So, in order to prevent excessive profits, at the expense of the taxpayers, renegotiation procedures were adopted, for the purpose of permitting adjustment, in the light of experience gained in the actual manufacture of war equipment.

Thus, retroactivity of renegotiation, which is one of the defendants' chief grounds of complaint, was inherent in the very method of manufacturing war materiel, through contracts with the Government.

Judge Denman, in the opinion in Spaulding v. Douglas Aircraft Co., Inc., supra, has contrasted retroactivity in the renegotiation statute with similar provisions in taxing statutes. He says [154 F.2d 419]:

"Though in essence different from taxation, the power in war to recapture for the war treasury excessive profits from existing contracts is certainly as great as the power in peace to tax in a succeeding year the income earned prior to the tax legislation."

As I have had occasion to deal with the problem on several occasions, I may be permitted to add some observations. The Constitution of the United States does not forbid making a federal civil statute operate retroactively. And the Supreme Court has stated definitely that the due process clause of the Fifth Amendment to the Constitution is not a limitation upon the taxing power of the Congress. Brushaber v. Union Pacific R. Co., 1916, 240 U.S. 1, 24, 25, 36 S.Ct. 236, 60 L.Ed. 493, L.R.A.1917D, 414, Ann.Cas. 1917B, 713; Steward Machine Co v. Davis, 1937, 301 U.S. 548, 581, 584, 57 S.Ct. 883, 81 L.Ed. 1279, 109 A.L.R. 1293.

▉ Retroactivity in tax legislation is an accepted policy. Up to 1934, nineteen income tax measures were adopted, every one of which applied to income earned during the entire year in which the Act was passed. Retroactive tax statutes are constitutionally unobjectionable. See: Mertens, Law of Federal Income Taxation, 1942, Vol. 1, Sec. 4.15; Frederick A. Ballard, Retroactive Federal Taxation, 1935, 48 Harvard Law Review, 592; and see, Cooper v. United States, 1930, 280 U.S. 409, 50 S.Ct. 164, 74 L.Ed. 516; Milliken v. United States, 1931, 283 U.S. 15, 51 S.Ct. 324, 75 L.Ed. 809; Burnet v. Wells, 1933, 289 U.S. 670, 53 S.Ct. 761, 77 L.Ed. 1439; Helvering v. Bullard, 1938, 303 U.S. 297, 302, 58 S.Ct. 565, 82 L.Ed. 852; Welch v. Henry, 1938, 305 U.S. 134, 146–149, 59 S.Ct. 121, 83 L.Ed. 87, 118 A.L.R. 1142; Martz v. Commissioner, 9 Cir., 1936, 82 F.2d 110; Wilgard Realty Co., Inc. v. Commissioner, 2 Cir., 1942, 127 F.2d 514; Cittadini v. Commissioner, 4 Cir., 1943, 139 F.2d 29; Robinette v. Commissioner, 9 Cir., 1945, 148 F.2d 513, 514; and see my opinion in Union

Packing Co. v. Rogan, D.C.Cal., 1937, 17 F.Supp. 934, 938. Retroactivity has also been sustained when incorporated into special taxing statutes aimed at certain particular profits. Thus, for instance, the Silver Purchase Act of June 19, 1934, 48 Stats. 1178, Ch. 674, Sec. 8, 26 U.S.C.A. Int.Rev.Code § 1805—which imposed on the transfer of any interest in silver bullion a tax of 50 per cent of the profits over cost, and was made applicable to transfers made on and after May 15, 1934, and prior to the date of the Act—was held to be valid. United States v. Hudson, 1937, 299 U.S. 498, 57 S.Ct. 309, 81 L.Ed. 370. The Revenue Act of 1936 levied a tax of 80 per cent on income derived from federal excise taxes which a processor passed on to others and which he was not called upon to pay, or which were refunded to him because the Agricultural Adjustment Act, 7 U.S.C.A. § 601 et seq., was declared unconstitutional. This was denominated a "tax on unjust enrichment." 26 U.S.C.A. Int.Rev.Code, § 700. It was referred to colloquially as the "windfall" tax. Its validity was sustained. Sportswear Hosiery Mills v. Commissioner, 3 Cir., 1942, 129 F.2d 376; White Packing Co. v. Robertson, 4 Cir., 1937, 89 F.2d 775; Steinhagen Rice Milling Co. v. Scofield, 5 Cir., 1937, 87 F.2d 804; Wilson Milling Co. v. Commissioner, 8 Cir., 1943, 138 F.2d 249; and see my opinion in Union Packing Co. v. Rogan, D.C.Cal., 1937, 17 F.Supp. 934. It is evident, therefore, that if, through the taxing power, the Government can *appropriate or capture* excessive profits derived from past dealings between individuals or profits derived from private transactions which the Congress considers to be "unjust enrichment," it has even greater power to *reappropriate or recapture, by renegotiation,* excess war profits made by persons engaged as contractors or subcontractors in manufacturing war materiel with public money, whether the profits accrued or the contract was entered into in the year when the enactment was made or before. No estoppel can arise against the Government from the failure of the Congress to enact a statute before war contracts were made. War does not wait for legislative bodies.

In brief, the problem reduces itself to this almost self-evident axiom: Whether the money was paid directly to a contractor, or, through him, to a subcontractor, it was public money raised by public taxation or by the pledging of the credit of the Government. And the Government, which paid it, has the right to recapture some of it, in pursuit of a policy of control of a war economy which it subsidizes, and in order to prevent unjust enrichment by individuals, through war contracts, at the expense of the public weal.

Hence the following rulings:

1. The motion of the Government for judgment on the pleadings or, in the alternative, for summary judgment is denied.

2. The motion of the defendants for judgment on the pleadings or, in the alternative, for summary judgment is denied.

3. The Court, ruling on the merits of the cause, orders judgment for the plaintiff in the sum of $113,709.19, with interest at the rate of six percent per annum from March 13, 1943.