BALTIMORE CONTRACTORS, INC., PETITIONER, *v.* RENEGOTIATION BOARD, RESPONDENT

Docket Nos. 953–R, 954–R.   Filed February 9, 1965.

*Robert D. Wallick*, for the petitioner.
*William E. Nelson* and *R. Dickey Hamilton*, for the respondent.

Respondent has determined by unilateral orders dated December 6, 1956, that petitioner realized excessive profits of $50,000 on three contracts completed in 1951 and $100,000 on one contract completed in 1952. Petitioner contests respondent's determination of excessive profits for both years.

The evidence was heard by a commissioner of the Court and his findings are the basis for our findings of fact herein. Some of the facts have been stipulated.

### FINDINGS OF FACT

The stipulated facts are included herein by this reference.

Petitioner is a Maryland corporation engaged in the general construction business with its principal office in Baltimore, Md. It was incorporated in 1945 and took over the business formerly conducted by Victor Frenkil who became petitioner's president and the owner of substantially all of its common stock.

Petitioner kept its books and records and filed its Federal income tax returns on a completed-contract and a calendar year basis.

Some of petitioner's contracts were with private industries, some with States and municipalities, and some with the Federal Government. Its total net sales and profits for the years 1946 to 1952, inclusive, were as follows:

| Year | Sales | Profits |
| --- | --- | --- |
| 1946 | $1,942,393 | $128,589 |
| 1947 | 2,690,680 | 477,125 |
| 1948 | 10,153,263 | 787,054 |
| 1949 | 4,159,255 | 82,602 |
| 1950 | 2,281,320 | 21,020 |
| 1951 | 9,968,547 | 243,147 |
| 1952 | 9,648,682 | 787,310 |

Petitioner completed three contracts in 1951 and one in 1952 for the General Services Administration (GSA), all of which were renegoti-

able contracts as defined in the Renegotiation Act of 1951. The contracts were:

*Dated*

WA–1pb–6398 (Revere Copper & Brass plant)_____ June 23, 1950
GS–03–B–1194 (Sun Building)_____as of June 11, 1951, executed July 16, 1952
GS–00–B–2166 (Dayton warehouse)_____ Jan. 31, 1951
GS–00–B–2083 (Sharonville warehouse)_____ Oct. 13, 1950

Contract WA–1pb–6398 was for processing machinery and equipment and for repairs and preservation of structures at the Revere Copper & Brass Co. plant at Halethorpe, Md. This was a negotiated cost-plus-fixed-fee contract. Petitioner was to be reimbursed for all costs incurred at the contract site and receive a fixed fee, as finally agreed upon, of $8,412. Upon completion of the contract petitioner received a payment of $198,133. Its total costs, including prime costs, indirect and selling expenses, and general administrative expenses, prorated on the basis of total prime costs, were $202,865. This amount included subcontracting costs of $64,670. Petitioner sustained a loss on the contract of $4,732.

Contract GS–00–B–2166 was for the installation of fire protection facilities, including a sprinkler system, at the Dorothy Lane Warehouse, Dayton, Ohio. Petitioner was awarded the contract as the lowest bidder after GSA had advertised for competitive sealed bids. Petitioner's bid of $358,500 was approximately $6,000 lower than the only other bid. The contract price was later increased by changes in specifications to $365,370. The Dorothy Lane Warehouse was being used for storage of crude rubber. It was said to contain bales of crude rubber of a value of $50 million.

In preparing its bid on the job petitioner estimated its overhead and profits at 20 percent of costs, other than the cost of the sprinkler system, and 10 percent of the sprinkler system cost. It added $14,725 for "Contingent—Unknowns & Escalation" and $7,500 unidentified.

At the time petitioner submitted its bid it had a quotation from Automatic Sprinkler Co. to install the sprinkler system called for in the contract for $172,000.

The contract was declared "substantially completed" by November 2, 1951. The time for completion was extended for 75 days.

Petitioner's total pay on the contract was $365,370. Prime costs were $303,721, including subcontracting in the amount of $250,576.60. Under an accounting agreement between respondent and petitioner, based on the ratio of contract prime costs to total prime costs, there were allocated to the contract indirect expenses of $6,277 and selling, general, and administrative expenses of $12,456, making total costs of $322,454 and net profits of $42,916.

Contract GS–00–B–2083, completed in 1952, was for the installation of fire protection facilities, including a sprinkler system, at the

Federal Supply Service warehouses at Sharonville, Ohio. Those warehouses, nine in number, also were used for storing crude rubber and other products. They were said to contain about 288 million pounds of rubber of a value of approximately $170 million.

The contract was executed by GSA and petitioner on October 13, 1950. Its completion was required within 250 days of the notice to commence, which petitioner received October 30, 1950. For justifiable delay the time for completion was extended 187 days. The contract was declared substantially completed January 10, 1952.

In letting this contract GSA advertised for sealed competitive bids August 31, 1950. Petitioner's bid of $1,118,000 was the lowest of six bids received. The highest of the six bids was $1,411,000. The bids were all in excess of GSA's estimate and were all rejected. On re-examination of the specifications, GSA found that the pipe called for was larger and of a more expensive type than was required and modified the specifications in that respect, reducing its estimate to $949,440.

Thereafter, GSA conferred with petitioner requesting a reduction of its bid to reflect the change in specifications. Petitioner estimated that the resulting savings would not exceed $70,075. However, by letter dated October 11, 1950, petitioner offered to accept the contract for $955,000, reducing its bid by the approximate amount of the minimum savings estimated by GSA on the changes in specifications.

The original contract price of $955,000 was subsequently increased by changes in specifications to $1,005,500.52. Petitioner's prime costs were $767,070, of which the amount of $637,340.27 was paid to subcontractors. There were allocated to the contract $16,844 indirect expenses and $32,748 selling, general, and administrative expenses on the basis of the ratio of prime costs of the contract to total prime costs for the entire year. This resulted in a total cost of $816,662 and a net profit of $188,839.

Before closing the contract, petitioner had received a commitment from Blaw-Knox Co. to install the sprinkler system for $535,176. The final cost of the sprinkler system, which was subcontracted to another company, was $426,365.

The most important feature of the Sharonville and Dayton contracts was the installation of complete automatic sprinkler systems. The related work included excavating, constructing reservoirs, pump and valve houses, and laying pipe. Petitioner was directly responsible to GSA for the sprinkler systems as well as the other work. The cost of the work performed by subcontractors amounted to $637,340.27.

Some of the work performed by petitioner and its subcontractors at Sharonville was unsatisfactory. Operational difficulties developed in both the sprinkler system and other equipment. There were numerous complaints by GSA officials about delays in the work and the inefficiency of the workmen.

Contract GS–03–B–1194 was for renovation of the Sun Building, 911 and 13–15 West Baltimore Street, Baltimore, Md. The contract was negotiated and a letter of intent executed June 11, 1951. A final contract as of that date was executed July 16, 1951. The original contract price was $250,000 which was increased by changed orders to $299,009. Completion of the work was required by August 25, 1951.

GSA determined that this contract was substantially completed by August 24, 1951, although it was not actually finished until October of that year. Petitioner expended $204,565 for prime costs of material, labor, subcontracts, and other direct costs. The cost of the subcontracting was $119,873.01. There were allocated to the contract $4,228 for indirect expenses and $8,390 for selling, general, and administrative expenses, computed on the basis of the ratio of prime costs of this contract to prime costs for the entire year 1951. This resulted in total costs of $217,183 and net profits of $81,826.

The Sun Building contract involved the renovation of the building formerly occupied by the Baltimore Sun newspaper. It was being rehabilitated for occupancy by the Air Research and Development Command, a military agency of the U.S. Government. It was understood that the work was urgent because of the Korean conflict and that the building was to occupied by the Air Command while it was being done. About 400 of the agency's personnel were already in the building when petitioner began operations and the number increased while the work was in progress. The occupancy of the building put the petitioner at a considerable disadvantage in the performance of its contract.

The Sun Building was an old building and was in bad condition throughout. Some of the floors were warped and badly worn from the use of heavy printing machinery and were stained with oil and ink. Some of the walls and ceilings had to be rebuilt. The plumbing and electrical wiring were obsolete and had to be replaced. All of these conditions added to the hazards and difficulties of the renovation, particularly that of locating and handling the electrical wiring without being able to cut off the current in the building. Petitioner was further handicapped by not being able to procure any plans of the building showing where and how the plumbing and wiring had been installed.

The new plumbing, heating, and electrical wiring were done by subcontractors, some of whom, especially the electrical subcontractors, insisted on cost-plus contracts, with petitioner assuming the risk of unknown and unforeseeable difficulties. The cost to petitioner of the electrical subcontracting alone was $87,461.

Petitioner had had considerable experience in the rehabilitation of old buildings and was known to be well equipped for and proficient in that type of work. It had a force of trained workmen who were

experts in that field. Petitioner put one of its best men in charge of the Sun Building project with instructions to pick his own crew of workmen. Some of petitioner's best skilled workers were called in from other jobs.

Many of the essential materials at the time were in short supply. A number of petitioner's top-level employees were required to expend considerable time and efforts obtaining materials and coordinating the work. The engineering and designing work was performed by petitioner's office staff.

Petitioner received the following letter dated March 13, 1954, from the commanding general of the Air Research and Development Command:

Mr. VICTOR FRENKIL
*Baltimore Contractors Inc.*
*711 S. Central Ave.*
*Baltimore, Maryland*

DEAR MR. FRENKIL: As the Air Research and Development Command nears the third anniversary of its establishment, I want to express my appreciation and that of my associates for the able assistance that you and your organization have given to this Command.

In particular, the work of Baltimore Contractors in modification of the Old Sun Building to adapt it for the occupancy of this Command was most expeditiously and commendably carried out.

Sincerely yours,

(S)  D. L. Putt
D. L. PUTT
*Lieutenant  General,  USAF*
*Commander*

Petitioner completed a total of 22 rehabilitation contracts in 1951 and 27 in 1952. Two of those completed in 1951 were Government contracts. There were no Government rehabilitation contracts in 1952. Petitioner's net profits on the 1951 contracts, as a percentage of total costs, with overhead expenses allocated on the basis of prime costs, were approximately the same on Government and non-Government rehabilitation contracts, 18.329 percent for Government and 18.323 percent for non-Government. In 1952 there were profits of 23.76 percent of costs on the non-Government contracts.

The final sales (contract prices), costs, and profits, and profits as a percentage of sales and as a percentage of costs on each of the 1951 and 1952 renegotiable contracts were as follows:

|  | Sales | Costs | Profits | Percent of sales | Percent of costs |
|---|---|---|---|---|---|
| Halethorpe | $198,133 | | ($4,732) | | |
| Sun Bldg | 299,009 | $217,183 | 81,826 | 27.4 | 37.7 |
| Dayton | 365,370 | 322,454 | 42,916 | 11.7 | 13.3 |
| Sharonville | 1,005,501 | 816,662 | 188,839 | 18.7 | 23.1 |

Petitioner's actual profits and its profits as redetermined by the Renegotiation Board on its three renegotiable contracts in 1951 and its one contract in 1952, and its profits as a percentage of sales, were as follows:

| Year | Actual profits | Percent of sales | Renegotiated profits | Percent of sales |
|---|---|---|---|---|
| 1951 | $120,010 | 13.9 | $70,010 | 8.6 |
| 1952 | 188,839 | 18.7 | 88,839 | 9.8 |

Petitioner's sales, costs, and profits on renegotiable and nonrenegotiable contracts in 1951 and 1952 were as follows:

| | Sales | Costs | Profits | Percent of sales | Percent of costs |
|---|---|---|---|---|---|
| 1951: | | | | | |
| Renegotiable | $862,512 | $742,502 | $120,010 | 13.9 | 16.2 |
| Nonrenegotiable | 9,106,035 | 8,982,898 | 123,137 | 1.35 | 1.37 |
| 1952: | | | | | |
| Renegotiable | 1,005,501 | 816,662 | 188,839 | 18.7 | 23.1 |
| Nonrenegotiable | 8,643,181 | 8,044,710 | 598,470 | 6.92 | 7.44 |

Petitioner's total sales and profits or losses on Government and non-Government contracts during the years 1946 to 1952, inclusive, were as follows:

| Year | Total sales | | Profit or loss | |
|---|---|---|---|---|
| | Government contracts | Non-Government contracts | Government contracts | Non-Government contracts |
| 1946 | $141,426 | $1,729,655 | $56,454 | $75,018 |
| 1947 | 106,092 | 2,361,242 | 37,463 | 409,804 |
| 1948 | 435,936 | 9,470,387 | (23,599) | 810,226 |
| 1949 | None | 3,921,528 | None | 82,637 |
| 1950 | None | 2,281,320 | None | 20,961 |
| 1951 | 862,347 | 9,106,035 | 120,012 | 127,331 |
| 1952 | 1,005,501 | 8,643,181 | 188,777 | 598,459 |

Petitioner's fixed assets and net worth in each of the years 1947 to 1952, inclusive, were as follows:

| Year | Net worth | Fixed assets at cost | Depreciation and amortization | Fixed assets after depreciation and amortization |
|---|---|---|---|---|
| 1947 | $252,292.83 | $84,490.25 | $20,823.55 | $63,666.70 |
| 1948 | 518,588.79 | 133,154.16 | 30,417.02 | 102,737.14 |
| 1949 | 1,036,147.87 | 161,848.70 | 40,200.95 | 173,834.52 |
| 1950 | 1,054,773.58 | 196,847.78 | 52,860.06 | 189,413.37 |
| 1951 | 1,084,033.23 | 333,330.57 | 82,860.68 | 288,906.98 |
| 1952 | 1,297,059.30 | 410,817.13 | 113,840.10 | 328,425.56 |

Petitioner realized excessive profits on renegotiable contracts of $25,000 in 1951 and $100,000 in 1952.

OPINION

KERN, *Judge:* Petitioner contends that the provisions of the Renegotiation Act of 1951 are not applicable to the two construction contracts here involved which were awarded prior to the date of the approval of the Act (Mar. 23, 1951). It argues that the retroactive application of that Act to these contracts would be unconstitutional. Either as a buttress of this argument or as a separate contention, it also argues that, notwithstanding the provisions of the Act, it was not the intent of Congress, as disclosed by the legislative history of the Act, that construction contracts entered into by the General Services Administration as a result of competitive bidding be subjected to renegotiation.

With regard to the constitutional question, petitioner concedes the constitutionality of the Act as applied to many contracts including contracts for the procurement of "military hardware," but it argues that the retroactive abrogation of the contract rights here involved cannot be justified as a constitutionally valid exercise of the war power of Congress because the Korean conflict was not the "total global warfare" referred to by the Supreme Court when it held the Renegotiation Act of 1942 to be constitutional in *Lichter* v. *United States,* 334 U.S. 742, 754, 755. To the contrary, according to petitioner's argument, the Korean conflict was merely "a limited police action for which the political authorities chose not to declare war but, instead, to merely proclaim a state of emergency," and economic conditions did not make it necessary for Congress to provide for the retroactive renegotiation of construction contracts such as those here involved.

The fact that Congress did not make a formal declaration of war in connection with the Korean conflict is stated by petitioner on brief to be "an important distinction" but this statement is immediately followed by the words "we do not rely on such technicalities alone." We agree with petitioner's implicit recognition that the nomenclature used by Congress with regard to the Korean conflict is a technicality without constitutional significance. Moreover, we cannot accept petitioner's characterization of the Korean conflict as "a limited police action" or its argument that the constitutional doctrine of the *Lichter* case was intended to be limited to "total global warfare." Regardless of the official designation attached to the Korean conflict, it was a long and costly struggle carried on halfway around the world in which hundreds of thousands of members of the Armed Forces of the United

States, many of them conscripted for service, fought bloody battles, and which entailed from its beginning the possibility of causing the intervention against those forces of two major world powers. In our opinion it would be contrary to reality for us to consider the Korean conflict to be "a limited police action." While the Supreme Court pointed out in its opinion in the *Lichter* case at page 755 that the war which occasioned the enactment of the Renegotiation Act of 1942 was "total global warfare" it used that phrase in its discussion of the circumstances which, as the Court stated at page 765, "*amply* demonstrated" (emphasis supplied) the value of production of war supplies in winning the war and which led to its conclusion that "it was *well within* the outer limits of the constitutional discretion of Congress and the President to * * * [provide for such production] under the terms of the Renegotiation Act." (Emphasis supplied.) It is not our understanding of the *Lichter* case that its holding was limited to the circumstances of "total global warfare." It is our understanding that the Supreme Court was of the opinion that if this country was engaged in warfare which rendered a Renegotiation Act "necessary and proper" for the execution of the war powers of Congress and its power to support armies, then such an act is constitutional, and that the circumstances of World War II *amply* demonstrated such necessity and propriety. We are unable to conclude that the circumstances of the Korean conflict fail to demonstrate the necessity and propriety of similar legislation, even though not as "amply."

Petitioner's principal argument on the issue of constitutionality is as follows: Granting the general constitutionality of the Renegotiation Act here in question, its retroactive application to construction contracts entered into pursuant to competitive bidding such as are here involved is unconstitutional because at the times when those contracts were executed, when the Renegotiation Act was enacted, and when the contracts were performed the construction business was not a boom business in which a lack of competition caused unreasonably high prices and excessive profits, and therefore the application of the provisions of the Renegotiation Act to such contracts would not be a necessary and proper exercise of the war powers of Congress.

Assuming *arguendo* that petitioner is correct in its contention that the Korean conflict did not cause the construction business to become such a boom business as to make completely ineffective the safeguards of competition, we are unable to conclude that the *danger* of such an eventuality was so minimal as to make legislation enacted for the purpose of protecting the war effort from such danger so arbitrary and unreasonable as to be outside "the outer limits of the constitutional

discretion of Congress" under the power granted to it by the Constitution to raise and support armies.

In the *Lichter* case it was held that Congress in time of war had the constitutional power to apply retroactively the provisions of a Renegotiation Act to construction contracts. In *Bertelsen* v. *Cooney*, 213 F. 2d 275, it was held that courts are concerned only with the existence of the power of Congress to act under the war powers and not with the wisdom, fairness, or necessity of the legislation. In *Hirabayashi* v. *United States*, 320 U.S. 81, 93, the Supreme Court said as follows:

Since the Constitution commits to the Executive and to Congress the exercise of the war power in all the vicissitudes and conditions of warfare, it has necessarily given them wide scope for the exercise of judgment and discretion in determining the nature and extent of the threatened injury or danger and in the selection of the means for resisting it. * * * Where * * * the conditions call for the exercise of judgment and discretion and for the choice of means by those branches of the Government on which the Constitution has placed the responsibility of war-making, it is not for any court to sit in review of the wisdom of their action or substitute its judgment for theirs.

While petitioner concedes that the construction contracts here involved are subject to the Renegotiation Act by its specific terms, petitioner contends vigorously that the legislative history of the Act indicates that Congress contemplated the exemption of such contracts from the provisions of the Act by a determination of the Renegotiation Board that they had no direct or immediate connection with the national defense. No such determination as to these contracts was ever made, and we are not persuaded that the Board could have properly made such a determination with regard to contracts for the construction of facilities for the safe storage of strategic materials such as rubber. The wording of the Act shows that Congress intended that it should apply to contracts of this type unless and until the Board should determine that they were not directly related to the war effort and should therefore be exempted from the provisions of the Act. Since the Board failed (properly in our opinion) to make this determination, it was obviously contemplated by Congress that the Act would apply to these contracts even though some individual Members of Congress may have mistakenly considered it probable that such a determination would be made.

Having concluded that the application of the Renegotiation Act to all of the contracts here in question is constitutional, we turn to the question of the extent, if any, to which the profits on the several

**620**

contracts here involved were "excessive profits" within the meaning of section 103 of the Renegotiation Act of 1951.[1]

Respondent, the Renegotiation Board, has determined that petitioner realized excessive profits of $50,000 in 1951 and $100,000 in 1952.

There are three principal contracts involved: The fire-protection contracts at the Dayton and Sharonville, Ohio, warehouses and the contract for renovation of the Sun Building at Baltimore, Md. The Dayton and Sun Building contracts were completed in 1951 and the Sharonville contract in 1952. A third Government contract at the Revere Copper & Brass plant at Halethorpe, Md., a cost-plus-fixed-fee contract, was completed in 1951, but that contract resulted in a small loss to petitioner and is not directly involved here.

The Dayton and Sharonville contracts were similar in character. They both involved the installation of sprinkler systems and other fire-protection work at Government-operated warehouses. The Sun Building contract involved the renovation of the Sun Building for occupancy by the Air Research and Development Command.

On the three contracts completed in 1951 petitioner's combined sales (contract prices) were $862,512 and its profits $120,010. On the 1952 contract the contract price was $1,005,501 and the profit $188,839.

Respondent's renegotiation of petitioner's three 1951 contracts left it with a profit of $70,010 or 8.6 percent of sales, and in 1952 a profit of $88,839 or 9.8 percent of sales.

In its argument respondent contends that its determination of petitioner's excessive profits is "quite lenient" when comparisons are made, percentagewise, of petitioner's profits on renegotiable and nonrenegotiable business and of its 1951 and 1952 profits with those for the prior

---

[1] SEC. 103. DEFINITIONS.

For the purposes of this title—

\* \* \* \* \* \* \*

(e) EXCESSIVE PROFITS.—The term "excessive profits" means the portion of the profits derived from contracts with the Departments and subcontracts which is determined in accordance with this title to be excessive. In determining excessive profits favorable recognition must be given to the efficiency of the contractor or subcontractor, with particular regard to attainment of quantity and quality production, reduction of costs, and economy in the use of materials, facilities, and manpower; and in addition, there shall be taken into consideration the following factors:

(1) Reasonableness of costs and profits, with particular regard to volume of production, normal earnings, and comparison of war and peacetime products;

(2) The net worth, with particular regard to the amount and source of public and private capital employed;

(3) Extent of risk assumed, including the risk incident to reasonable pricing policies;

(4) Nature and extent of contribution to the defense effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance;

(5) Character of business, including source and nature of materials, complexity of manufacturing technique, character and extent of subcontracting, and rate of turn-over;

(6) Such other factors the consideration of which the public interest and fair and equitable dealing may require, which factors shall be published in the regulations of the Board from time to time as adopted.

years 1946 to 1950, inclusive. Petitioner in its argument points out that over the prior several years its profits, percentagewise, on renegotiable and nonrenegotiable contracts were about the same.

We do not think that excessive profits on renegotiable contracts can be determined solely on the basis of a comparison of the contractor's profits, either on renegotiable and nonrenegotiable business or for current years and prior years. Particularly is this true where, as here, the contracts under consideration are construction contracts with widely varying characteristics and profit potentials.[2]

While normal earnings is an ever-present factor in determining the reasonableness of profits (sec. 103 (e)'(1), Renegotiation Act), there are other factors of varying applicability and importance, depending on the type of product manufactured or services performed by the contractor. Petitioner's contracts were all for services, as distinguished from manufactured products. The profits on both Government and non-Government contracts fluctuated widely from year to year.

Respondent further contends that the quality of petitioner's work on both of the fire-protection contracts was below standard and on the renovation contract only average.

There is conflicting evidence as to the quality of petitioner's services on these contracts. We have endeavored to evaluate the evidence as best we can and, as to performance, it is only in the work at the Sun Building that we find those plus values which we think Congress intended should receive favorable consideration in the determination of excessive profits. On that contract petitioner appears to have done an outstanding job under difficult conditions. According to the evidence, it required an unusual amount of on-the-job engineering and skilled workmanship. It involved considerable risks, both as to the personal safety of the workmen and as to the ultimate profits. Petitioner was required to obtain all of the necessary materials in a market restricted by wartime scarcities. The subcontracting was not proportionately as large as on the fire-protection contracts.[3] Because of the subcontractors' risks, some of it was on a cost-plus basis. The short time limit and the occupancy of the premises by the Air Research and Development Command during the performance of the work were factors which undoubtedly added to petitioner's cost and responsibilities on the job.

There is support in the evidence for petitioner's contention that on the Sun Building contract the indirect costs such as engineering, supervising, and general overhead allocated to the contract on a pro rata

---

[2] "Construction contracts, on the other hand, involve custom work, each job differing as to plans and specifications, site, physical conditions encountered, skill required, and costs." Guide for renegotiation of "Construction and Architect-Engineer Contracts," Renegotiation Staff Bulletin No. 12 (1952), 2 C.C.H. Government Contracts Reporter, par. 25,535.03.

[3] Subcontracting accounted for about 58 percent of the prime costs on the Sun Building contract and over 80 percent on the Dayton and Sharonville contracts.

basis of each year's direct costs were inadequate, resulting in an overstatement of the actual profit on the contract.

On the whole, we find that petitioner's performance on the Sun Building contract merited the commendation which it received from the Air Research and Development Command, and conclude that on this contract petitioner achieved a very high degree of efficiency and made an outstanding contribution to the war known as the Korean conflict.

However, with regard to the two fire-protection contracts, we do not find the evidence convincing that on these contracts petitioner achieved a high degree of efficiency or made an outstanding contribution to the war effort, or did anything more than was normally to be expected.

Respondent further contends that petitioner's profits on both the Sun Building and the Sharonville contracts were due in large part to errors made by GSA representatives in negotiating the contracts. As to the Sun Building contract, respondent contends that the GSA negotiator failed to include in the contract a clause for renegotiation of the contract by GSA based on the actual costs, pursuant to clause 12(a) of "General Conditions" (negotiated lump-sum contracts)[4] and according to GSA's established policy of awarding lump-sum contracts. Respondent contends that the renegotiation clause was inadvertently omitted from the contract, contrary to the intention of both parties, and that this error resulted in a "windfall" profit to petitioner of approximately $67,000. The contract did include a provision that it was subject to the Renegotiation Act of 1951.

As to the Sharonville contract, respondent contends that the GSA negotiator made an error of $90,000 in estimating costs, due to an overallowance for inflation in the cost of both materials and labor between March 21, 1950, when the first estimate was made, and October 5, 1950, when the final estimate was made. The contract was dated October 13, 1950.

We do not attach the importance respondent does to its argument that petitioner's profits were due in part to errors of the GSA representatives in negotiating the contracts. Obviously the Tax Court has no power to alter or revise the contracts. Respondent's contention in this regard appears to be that in the course of negotiations based on erroneous assumptions petitioner inferentially stated amounts estimated by it as reasonable profits. While we have considered the evidence on this point, it is our opinion that it has little, if any, value under the facts of these cases in assisting us in deciding the crucial

---

[4] Clause 12 of the "General Conditions" provided that before final payment the contracting officer would determine whether any excessive profits had been realized, meaning profits in excess of 6 percent of the costs incurred in performance of the original contract and 10 percent in performance of changes later made and, if so, the profits would be limited to those percentages.

question of the amount, if any, of excessive profits actually and ultimately received by the contractor.

In this connection petitioner makes the argument that there can be no excessive profits on contracts where the estimates were fair and reasonable and there has been no reduction in estimated costs due to the defense effort. As we have said, it is the reasonableness of the ultimate profits and not the bids or estimates with which the statute is concerned.

Petitioner protests that the Renegotiation Board "has improperly applied its averaging concepts used for manufacturing industries to general construction contractors such as petitioner."

We agree with petitioner's argument that the application to a construction contractor, such as petitioner, of the same percentage-of-profits standards applied in determining reasonable profits of the manufacturing industries might reach an inequitable result. In fact, there is that danger in the application of a percentage-of-profits formula to any type of contract. This was recognized by Congress in its refusal to provide such a formula and its adoption, instead, of the other tests set out in section 103(e) to be considered in determining excessive profits in all renegotiation contracts. However, we are not so much concerned here with the method used by the Renegotiation Board in making its determination as with the reasonableness of the results.

Analyzing the evidence as best we can and giving what, in our judgment, is due weight to the statutory factors, we have concluded that petitioner realized excessive profits of $25,000 in 1951 and $100,000 in 1952.

*An order will be issued in accordance herewith.*