**BALTIMORE CONTRACTORS, INC.,**
Petitioner,

v.

**The RENEGOTIATION BOARD,**
Respondent.

**No. 10090.**

United States Court of Appeals
Fourth Circuit.

Sept. 13, 1967.

Robert D. Wallick, Washington, D.C., (Morris Rosenberg, Baltimore, Md., and Robert M. Goolrick, and Steptoe & Johnson, Washington, D.C., on brief) for petitioner.

David L. Rose, Atty., Dept. of Justice (John W. Douglas, Asst. Atty. Gen., and Morton Hollander, Atty., Dept. of Justice, on brief), for respondent.

Before HAYNSWORTH, Chief Judge, and BRYAN and J. SPENCER BELL,* Circuit Judges.

HAYNSWORTH, Chief Judge:

We agree with the Tax Court that the Renegotiation Act of 1951 is a constitutional exercise of the war powers of Congress. The Korean Conflict was smaller than World War II, but its impact upon the nation's economy was heavy enough to warrant congressional invocation of the war powers to limit profits on defense contracts.

Within three weeks after the invasion of the Republic of Korea by the armies of North Korea,[1] the President authorized the use of American troops to repel the attack and announced a substantial increase in procuring and stockpiling defense-related materials.[2] Shortly thereafter, a bill,[3] modeled after the Renegotiation Act of 1942,[4] was introduced in the House. Although extensive hearings were held during August of 1950,[5] neither house of Congress acted upon the bill during that session.[6] However, when Congress convened in January of 1951, a similar bill was introduced, promptly passed both houses[7] and was signed into law on March 23, 1951.[8]

With certain exemptions,[9] the statute subjected to renegotiation all contracts with named government agencies to the extent of amounts received or accrued after January 1, 1951,[10] unless the contract had been executed prior to July 1, 1950.[11] Among the contracts to which the Act did not apply were those having no direct and immediate connection with the national defense.[12]

On October 13, 1950, and January 31, 1951, months after the opening of hostili-

---

\* Judge Bell expressed approval of the result in this case, though he died before the opinion was prepared.

1. June 25, 1950.

2. The Korean Situation—Message from the President of the United States July 19, 1950, 97 Cong.Rec. 10,626–629 (1950); H.Doc.No. 646, 81st Cong., 2d Sess. (1950).

3. H.R. 9246, 81st Cong., 2d Sess. (1950).

4. 97 Cong.Rec. 582, 1478 (1950).

5. Hearings before the House Committee of Ways and Means on H.R. 9246, 81st Cong., 2d Sess., p. 1 (1950).

6. H.Rep.No. 7, 82d Cong., 1st Sess., p. 1 (1951).

7. H.Rep.No. 7, 82d Cong., 1st Sess. (1951); S.Rep.No. 92, 82d Cong., 1st Sess. (1951), U.S.Code Cong. & Admin. Serv.1951, p. 1339.

8. 65 Stat. 7, 50 U.S.C.A.App. § 1211 et seq.

9. See 50 U.S.C.A.App. § 1216.

10. 50 U.S.C.A.App. § 1212(a).

11. 50 U.S.C.A.App. § 1212(b); cf. 50 U.S.C.A.App. § 1212(c).

12. § 1216 Exemptions—(a) Mandatory exemptions

The provisions of this title [§§ 1211–1223 of this Appendix] shall not apply to * * *

(6) any contract which the Board determines does not have a direct and immediate connection with the national defense. * * *

50 U.S.C.A.App. § 1216(a)(6).

ties and the hearings during the preceding August on the original version of the Renegotiation Act of 1951, General Services Administration [13] and Baltimore Contractors, Inc. executed two contracts [14] for the construction of fire prevention facilities at government warehouses [15] used to store crude rubber and other strategic materials.[16] The contractor completed the construction of the respective facilities in 1951 and 1952 and, under the completed contracts method of accounting, received the profits, respectively, in those years.[17]

After negotiations failed to establish the amount of excessive profits received by the contractor, the Board issued unilateral orders fixing the amount at $150,000. The contractor sought de novo redetermination of the amount in the Tax Court [18] and collaterally contended that the Act was unconstitutional. The Tax Court upheld the statute but found that the excessive profits had been only $125,000.[19] After denial of timely motions to reconsider and for review by the entire court, this appeal was filed.

Here the contractor contends that the Act is unconstitutional because the impact of the Korean Conflict upon the American economy did not justify congressional use of the war powers retroactively to renegotiate contracts.

Lichter v. United States,[20] which held the Renegotiation Act of 1942 [21] to be a law necessary and proper for carrying into execution the war powers of Congress, answers many of the questions with which we are faced. While the opinion is written in terms of "total global warfare," [22] like the Tax Court, we are of the opinion that its reach is not limited to warfare so far flung.

Clearly, congressional power to raise and support armies does not depend upon the existence of a declared war. It is enough if the exigencies of the situation justify congressional use of those powers in a certain way. World War II created a pressing need for rapid procurement of new materials, at a pace and in volume without precedent, causing a breakdown in contract cost and profit analysis in virtually every sector of the American economy.[23] In that atmosphere, renegotiation of defense contracts was found to be "well within the constitutional discretion of Congress. * *" [24] Similarly, the outbreak of hostilities in Korea, though in smaller degree, had a marked effect upon the economy. It spawned a "vast program of military

---

13. General Services Administration contracts are subjected to renegotiation by 50 U.S.C.A.App. § 1213(a).

14. Of the four contracts ultimately awarded to the appellant, only two require consideration. Of the others, one resulted in a loss to the contractor; the other was executed after January 1, 1951, and, as to it, the Act is admittedly constitutional.

15. The Dorothy Lane Warehouse, Dayton, Ohio, and the nine Federal Supply Service Warehouses, Sharonville, Ohio.

16. The warehouses contained bales of crude rubber valued at 220 million dollars and other materials. 43 T.C. No. 48 (1965).

17. The contractor kept records on a completed-contract, calendar-year basis.

18. See 50 U.S.C.A.App. § 1218.

19. 43 T.C. No. 48 (1965).

20. 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694.

21. The Court viewed that Act as a compilation of several statutes and amendments. Lichter v. United States, 334 U.S. 742, 755 n. 1, 68 S.Ct. 1294, 1301, 92 L.Ed.2d 1694.

22. Lichter, 334 U.S. 742, 755, 68 S.Ct. 1294, 1301, 92 L.Ed. 1694.

23. See Lichter, 334 U.S. 742, 757–764 nn. 5, 6, and 7, 68 S.Ct. 1306, 92 L.Ed. 1694.

24. Not only was it necessary and proper for Congress to provide for such production in the successful conduct of the war, but it was well within the outer limits of the constitutional discretion of Congress and the President to do so under the Renegotiation Act. Lichter, 334 U.S. 742, 765, 68 S.Ct. 1294, 92 L.Ed. 1694.

procurement" [25] of "items not included in the customary output of * * * plants, as well as many items that were wholly new and unfamiliar" [26] and "in enormous quantities far in excess of ordinary levels." [27] As a direct result, there occurred a breakdown in the ordinary processes of defense contract pricing, making it possible for contractors to realize excessive profits on defense contracts. Under the authority of *Lichter,* this was ample justification for congressional action aimed at renegotiation of defense contracts, even though the entire economy was not disrupted. In addition, the clear possibility of a direct military confrontation between the United States and one or both of the major Communist powers,[28] and the danger of a consequent expansion of the otherwise limited fighting into total global warfare, makes it absolutely clear that the Renegotiation Act of 1951 was a law necessary and proper to the exercise of congressional war powers, and was within the constitutional power of Congress.

*Lichter* also held retroactive application of the 1942 Act constitutional because the power of the Government to recover excessive profits extends to all war contracts, and a contract is a war contract whether executed before or after the passage of the Act.[29] Renegotiation of contracts was likened to governmental regulation of maximum prices and collection of excess profits taxes,[30] and the Court specifically held that it was not in the nature of a penalty or a deprivation of property without due process of law in violation of the fifth amendment.[31] Those principles are equally applicable to the present situation and dictate our conclusion that the contracts here are within the constitutional reach of the Act.[32]

■ The contractor also contends that, even though the Renegotiation Act of 1951 may be constitutionally applied to the procurement of military hardware, it cannot constitutionally reach construction contracts. Korea, it is said, had only a modest impact on the construction industry. The impact was quite substantial, however, for the total value in millions of dollars of all new construction in the United States increased from 24,163, in 1949, to 34,750, in 1952. The increase in federal spending and spending for military facilities was much more dramatic. All new federal construction increased from 1,177 million dollars in 1949 to 4,186 in 1952, while that for military facilities rose from 137 in 1949 to 1,388 in 1952. Indeed, in its petitions to the Tax Court, the contractor alleged, "Material shortages were acute at the time of the performance * * *," and claimed credit for its efficiency in obtaining the necessary priorities.

We do not reach the potentially interesting question arising out of the absence of any provision for a hearing on an issue of a contract's negotiability.

■ The Act was intended to reach only contracts having a direct and immediate relation to national defense. The Renegotiation Board was authorized to adopt regulations defining general exemptions and, under § 106(a) (6),[33] to exempt individual contracts having no such relation. There is no provision for

---

25. H.Rep. No. 7, 82d Cong., 1st Sess., p. 2 (1951).

26. Id.

27. Id.

28. One of which, through volunteers, did enter the conflict.

29. Lichter, 334 U.S. 742, 788, 68 S.Ct. 1294, 1318.

30. Lichter, 334 U.S. 742, 787, 68 S.Ct. 1294, 1317.

31. Lichter, 334 U.S. 742, 788, 68 S.Ct. 1294, 1318.

32. This is particularly true as the 1951 Act was introduced in Congress before the bidding on these contracts began and because the contractor knew of the constitutionality of the retroactive application of the 1942 Act.

33. 50 U.S.C.A.App. § 1216(a)(6).

a hearing, and the Board's decision is final and unreviewable.

In Litton Indus. of Md. v. Renegotiation Bd., 4 Cir., 298 F.2d 156, we held that this scheme did not amount to constitutional deprivation of a contractor who sought to have a contract treated as renegotiable. The theory was that the government is under no constitutional compulsion to provide any remedy for the enforcement of a right it has created against itself. That decision, of course, leaves open the question when a contractor, claiming an exemption, is denied a hearing at every stage of the proceedings.

This contractor is not in a position to raise the open question, however. In the administrative proceedings, it sought no exemption. It claimed none in the Tax Court. In answer to an inquiry from the Board with respect to the year 1952, the principal one involved, the contractor reported the basis upon which it classified contracts as renegotiable or nonrenegotiable; it reported the relevant one as renegotiable, and denied that it had any contract that might be regarded as borderline. In the Tax Court, it stipulated that both contracts were renegotiable under the Act, reserving only the general constitutional claim that the Act, as applied to the construction industry, exceeded congressional war powers.

■ When the question of renegotiability was not only uncontested, but conceded and stipulated, the contractor is not in a position to complain that a full hearing was not accorded it on that question.

Review of the Board's determination of the amount of excess profits is available in the Tax Court, but the Tax Court's decision on that question is not reviewable here.[34] The contractor has not sought it, limiting itself to the constitutional claims with which we have dealt. Finding no constitutional infirmity in the proceedings, the judgment of the Tax Court is affirmed.

Affirmed.

---

34. 50 U.S.C.A.App. § 1218(a) (Supp.1966).