S. S. SILBERBLATT, INC., AND THE STERLING COMPANY, PETITIONERS *v.* THE RENEGOTIATION BOARD, RESPONDENT

Docket No. 1041–R. Filed March 4, 1969.

*Edward J. Ross*, for the petitioners.
*Michael R. Lemov*, and *Stephen M. Truitt*, for the respondent.

OPINION

MULRONEY, *Judge:* A consolidated renegotiation proceeding was held by respondent with respect to petitioners for the fiscal year ended January 31, 1960. It resulted in respondent issuing an unilateral order which provided that of petitioners' profits realized during the aforesaid fiscal year from a Government contract and related subcontracts the amount of $1,900,000 ($1,764,853 after adjustment on account of State income taxes) was excessive within the meaning of the Renegotiation Act of 1951.

The parties have entered into a stipulation of facts and issues and submitted the case pursuant to Rule 30 of the Rules of Practice of this Court.

During its fiscal year ended January 31, 1960, and at all times material hereto, the petitioner, S. S. Silberblatt, Inc. (hereinafter the Contractor), was a corporation engaged in the general contracting business, and organized and existing under laws of the State of New York, with its office and principal place of business at New York, N.Y.

During its fiscal year ended January 31, 1960, and at all times material hereto, the petitioner, the Sterling Co. (hereinafter Sterling), was a partnership composed of Shephard S. Silberblatt, Bruce Silberblatt, and Karen Gerard, and constituted a related group with the contractor for the purposes of renegotiation proceedings.

On or about May 6, 1957, the contractor entered into housing contract No. AF–30(636)–136 (hereinafter the contract), with the United States, acting by and through the Department of the Air Force, for the construction of 1,685 dwelling units and servicing facilities, including site grading, underground utilities, streets, walks, and parking

areas, at the Plattsburg Air Force Base, Plattsburg, N.Y. The dwelling units were for military personnel and other Government employees.

The contract was made pursuant to the authority of the Capehart Housing Act, title VIII of the National Housing Act, as amended, 12 U.S.C. secs. 1748–1748(i) and 42 U.S.C. secs. 1594–1594(k). In general, the Capehart Act authorizes the Secretary of Defense or his designee to enter into contracts with bidders for construction of urgently needed housing for military personnel on land owned or leased by the United States, on or near a military reservation.

The building contract, pursuant to the Capehart Act, is with a newly organized "mortgagor-builder" corporation. The Act contemplates the securing of loans from lenders acceptable to the Federal Housing Commissioner by the "mortgagor-builder" corporation. The loans provide the funds for the construction. They are evidenced by notes and secured by mortgages on the housing units and are repayable with interest by the United States over a 25-year period. All stock of the mortgagor-builder corporation is placed in escrow upon execution of the contract and may be transferred only to the Secretary upon completion of the construction or termination pursuant to the contract. The Secretary is authorized to acquire the stock and exercise all rights as a stockholder and operate and improve the housing and dissolve the corporation upon termination of the mortgages.

In the instant case it is stipulated the procedure under the Capehart Housing Act was followed by the parties to the contract.

The contract was awarded to the contractor, as the lowest bidder, following the opening of bids which had been submitted on a competitive basis after public advertising. There were three bids submitted: that of the contractor in the amount of $25,874,100 and those of two others which were higher by approximately $1,600,000 and $2,726,000, respectively. The Capehart Housing Act establishes a maximum average price of $16,500 per family unit, making a total statutory maximum of $27,802,500. The Federal Housing Administration (FHA) estimated the cost of the project at $26,800,478. The Government was not required to accept the contractor's bid and could have attempted to negotiate a lower price.

Work under the contract was commenced at the site shortly after the award, and the project was completed in October 1959. The total contract price was $27,799,717, which included four added alternates and an increase based upon a wage determination. The housing covered by the contract was constructed pursuant to specifications furnished by the Department of the Air Force.

The housing facilities were built on Government-owned land, and were leased for 55 years to private corporations formed for such pur-

pose, called the mortgagor-builders, the stock of which was initially owned by the contractor. The stock of the mortgagor-builders was placed in escrow by the contractor at the time of the execution of the contract. The stock was endorsed in blank by the contractor. Resignations of all officers and directors of the mortgagor-builders were similarly placed in escrow at the time of execution of the contract. The escrow agreement provided that the stock and resignations were to be delivered only to the Department of the Air Force upon completion or termination of the project.

The mortgagor-builders obtained construction loans and mortgages pursuant to the provisions of 12 U.S.C. secs. 1748–1748(i). The mortgages and loans were from a private banking institution, the Chemical Bank New York Trust Co., repayable in installments over a 25-year period, with the remaining balance of principal due June 1, 1984. The mortgages were insured by the FHA and guaranteed by the Department of the Air Force.

The mortgagor-builders used the proceeds of the mortgage loans, advanced by the private banking lender, to pay construction costs. They then paid the balance to the contractor as its profit.

Upon completion of each separate building project, the stock of the mortgagor-builder relating to each such separate project, which had been held in escrow under an agreement whereby it would be delivered to the department upon completion or termination of the particular project, was delivered to the Secretary of Defense.

On completion, the buildings were allocated to military personnel. Payments of principal and interest on the mortgage notes are made to the lending institution by the Department of the Air Force from appropriations made available by Congress for such purpose. Such payments commenced after construction was completed, after the stock of the mortgagor-builder had been delivered to the Government by the contractor, and after the contractor had received its profit.

At or about March 1, 1968, the Government had paid to the lending institution, approximately $15,157,000 in principal and interest payments on the mortgages on the Plattsburg homes. The Government did not make the first payment on such mortgage until after the contractor had completed construction under the contract and after it had received its profit. Sterling performed work as a subcontractor for the contractor with respect to the contract. During petitioners' fiscal year ended January 31, 1960, petitioners had receipts and accruals from the contract and related subcontracts of Sterling.

As stated, renegotiation proceedings were instituted by respondent involving alleged excessive profits realized by the contractor and Sterling during the fiscal year ended January 31, 1960. By agreement

between all of the parties, the renegotiation proceedings against the contractor and against Sterling were consolidated for hearing and determination and the contractor was authorized to act for Sterling as its agent in connection with the renegotiation proceedings. Hereafter the term "petitioner" will be understood as referring to the related group of the contractor and Sterling. It was in these proceedings that respondent determined petitioners had realized excessive profits in the sum of $1,900,000.

The following is the issue stipulation that was filed by the parties:

It is hereby further stipulated and agreed:

15. In the event the Court holds (a) the Contract is not subject to the Renegotiation Act of 1951 (50 U.S.C. App. 1211, *et seq.*), or (b) the Contract is exempt from the Renegotiation Act pursuant to 50 U.S.C. App. § 1216(a)(9), or (c) the Renegotiation Act as applied to the Contract, or the determination of allegedly excessive profits issued by the Board in this case, is unconstitutional, the Court shall enter judgment that the petitioners realized no excessive profits for the aforesaid fiscal year. Otherwise, the Court shall enter judgment as determined by respondent that petitioners realized excessive profits from contracts and subcontracts subject to the Renegotiation Act in the amount of $1,900,000 for said fiscal year, less any applicable tax credit. The foregoing issues are the sole issues in this case.

Petitioner states the two issues to be decided are as follows: (1) "Is the Housing Contract subject to the Renegotiation Act" and (2) "Is the Renegotiation Act unconstitutional to the extent it may apply to Capehart Housing Contracts or to the determination of allegedly excessive profits issued by the Renegotiation Board in this case?"

Section 1212 of the Renegotiation Act (50 U.S.C. App.) provides for renegotiation of "all contracts with the Departments specifically named in section 103(a)" (50 U.S.C. App. sec. 1213(a)).[1] The last numbered section provides "The term 'Department' means * * * the Department of the Air Force."

It is difficult to understand how, in the light of such express statutory direction, there could be any argument that the contract here involved would not be *subject* to the Renegotiation Act. Petitioner does not discuss this plain statutory language which clearly declares that the Renegotiation Act is applicable to the Air Force contract that is here involved.

If it be thought there is any doubt about such applicability of the Renegotiation Act to Capehart housing contracts with the Department of the Air Force we need but turn to 50 U.S.C.A. sec. 1216(a)(9) (1969 pocket part), which exempts any construction contract awarded as a result of competitive bidding "other than a contract for

---

[1] Sec. 1216 that exempts some specifically described contracts from the application of the Renegotiation Act is not here applicable.

the construction of housing financed with a mortgage or mortgages insured under the provisions of title VIII of the National Housing Act, as now or hereafter amended [sections 1748–1748h of title 12]." Here it is stipulated this was a contract for construction of housing by petitioners that was financed by mortgages insured under the provisions of title VIII of the National Housing Act.

The legislative history of said section 1216(a)(9) shows conclusively that it was the intent of Congress that contracts for the construction of housing pursuant to the Capehart Act, such as involved in this case, were to remain subject to renegotiation:

> The exemption provided in this section is made not applicable to military housing construction financed with a mortgage or mortgages insured under the provisions of title VIII of the National Housing Act, as now or hereafter amended. The Committee was advised by the chairman of the Senate Banking and Currency Committee that that committee in framing legislation providing for military housing had relied upon the fact that such contracts would be subject to the Renegotiation Act. The Renegotiation Board has no objection to the exemption contained in this section. [*S. Rep. No. 582 to accompany H.R. 4904, 84th Cong., 1st Sess. (1955)*.]

We hold, in answer to the first stipulated issue, that petitioner's housing contract was subject to the Renegotiation Act.

50 U.S.C. App. sec. 1214, provides that if the contract is subject to the Renegotiation Act the "Secretary * * * shall insert in each contract * * * a provision under which the contractor agrees—(1) to the elimination of excessive profits through renegotiation; * * * (3) that he will insert in each subcontract * * * a provision under which the subcontractor agrees * * * to the elimination of excessive profits through renegotiation." This section goes on to provide in subsection (4) "A provision inserted in a contract or subcontract, which recites in substance that the contract or subcontract shall be deemed to contain all the provisions required by this section shall be sufficient compliance with this section." And the subsection goes on to provide that whether or not the specified clause is inserted in the contract to which the Act is applicable, the contract shall be considered as having been made subject to the Act to the same extent as if such provision had been inserted.

Paragraph 37(a) on page 26 of the contract here involved provides as follows:

> 37. Renegotiation.
>
> (a). This Housing Contract shall be subject to any Act of the Congress, whether heretofore or hereafter enacted and to the extent indicated therein, providing for the renegotiation of said Housing Contract and shall be deemed to contain all the provisions required by any such Act without subsequent amendment of this Housing Contract specifically incorporating such provisions.

As stated, petitioner does not discuss the statutes that plainly place Capehart contracts under the Renegotiation Act. Petitioner points out that 50 U.S.C. App. sec. 1214, further provides in subsection (4) that the renegotiation consent clause will only bind the contractor "if the contract * * * is subject to" the Renegotiation Act. Part of petitioner's argument is that the contract is not *subject* to the Renegotiation Act because the Act when so applied is unconstitutional. It is petitioner's position on brief that the Renegotiation Act is "unconstitutional or otherwise invalid as applied to this contract" and therefore "the Housing Contract is not subject to renegotiation despite the renegotiation clause" in the contract.

Petitioner makes some contention on brief that application of the Renegotiation Act to Capehart contracts would be invalid, because the Capehart projects are financed with "private funds." The argument is that these contracts should not be renegotiated because, as petitioner states on brief, "the basic concept of renegotiation is recapture of payments made by the Government." The argument ignores the fact it is the Government's unconditional obligation to repay the loan from which petitioner is paid his profits.[2]

The policy of renegotiation as declared by Congress in 50 U.S.C. App. sec. 1211, is that "excessive profits be eliminated" in contracts financed by funds made available "by appropriation and otherwise." It is the Government that ultimately pays, out of appropriated funds, the full contract price under Capehart housing contracts. It is obvious that this method of financing presents the same danger of excessive profits paid by the Government as direct Government payments to builders. It is to be noted that the Renegotiation Act applies to subcontractors who receive no payments from the Government. We hold the application of the Renegotiation Act to Capehart contracts is not rendered improper because of project financing by private loans that are ultimately repaid by the Government.

Petitioner's main argument is that the Renegotiation Act is unconstitutional under the Fifth Amendment to the extent that it might apply to Capehart housing contracts. The argument is based almost entirely on *Lichter* v. *United States*, 334 U.S. 742 (1948). In that case the Supreme Court held the Renegotiation Act of 1942 was not uncon-

---

[2] Paragraph 29, p. 9, of the contract provides as follows:

"The Department shall, to the extent that advances made against the mortgage-notes (identified in the Building Loan Agreement above referred to) have been approved by the Commissioner, make payments in accordance with the terms of said notes, provided that this obligation to make payments shall not become effective until the Commissioner shall have finally endorsed said notes for mortgage insurance or upon complete termination of the Housing Contract at the convenience of the Department prior to completion of the projects. The Department shall, upon the initial endorsement by the Commissioner of said notes for mortgage insurance, deliver to the mortgagee its guaranty of the payment of said notes."

stitutional as a denial of due process, as applied retroactively to war contracts made prior to the enactment of the Renegotiation Act. Petitioner reviews all of the factors mentioned in the *Lichter* opinion that the Court held justified a retroactive application of the law, such as: (1) The necessity for rapid procurement, (2) the specifications were not known or there was no time to prepare detailed specifications, (3) the items had never been made before or if they had estimates of cost were mere guesses, and (4) lack of competition. Petitioner argues on brief that "None of these factors has the remotest relationship to Capehart Housing."

We see no necessity for reviewing the facts and circumstances surrounding the enactment of the Capehart Act and the execution of the housing contracts entered into thereunder. In the *Lichter* case there was no statute providing for renegotiation at the time the contract was entered into and therefore no renegotiation clause in the contract. Under the specific terms of the contract and under the law at the time the contract was entered into the contractor had a right to all of the profits even if they were what might be termed excessive.

In the instant case the Renegotiation Act is being given a prospective application. It was in full force and effect at the time petitioner entered into the contract with the Department of the Air Force in 1957. The law rightly placed the renegotiation clause in the contract. By this clause petitioner, in the language of the statute (50 U.S.C. App. sec. 1214), "agrees * * * to the elimination of excessive profits through renegotiation."

It was on the authority of the Supreme Court decision in the *Lichter* case that we held the retroactive application of the Renegotiation Act of 1951 was constitutional when applied to contracts entered into during the Korean conflict and prior to the date of the enactment of the Renegotiation Act of 1951 on March 23, 1951. *Baltimore Contractors, Inc.* v. *Renegotiation Board,* 43 T.C. 611 (1965), affd. 383 F. 2d 690 (1967).

We do not understand that the constitutionality of the prospective application of the Renegotiation Act under the fifth amendment depends upon the existence of a war emergency, or the necessity of rapid procurement, or unknown specifications or the lack of competition. We know of no case so holding and petitioner cites none.[3] The Renegotiation Act merely provided for a method of contracting whereby

---

[3] It is not without significance that there are many renegotiation cases where the Renegotiation Act is given a prospective application and its constitutionality is not assailed though it is obvious the factors petitioner feels necessary to support constitionality were not present. Just to list a few:

*Martin Manufacturing Co.* v. *Renegotiation Board,* 44 T.C. 559 (1965). Renegotiation of 1959 and 1960 profits of a competitively bid procurement contract for manufacture of shirts and jumpers for the Armed Forces.

contractors who desired to contract with certain named departments had to agree to renegotiation procedure. It applied to all contracts with those departments after the passage of the Act in 1951. It applied to some contracts that had been entered into before the enactment of the Renegotiation Act such as those where the last payment had not been made. 50 U.S.C. App. sec. 1212. It is this retroactive application that has given rise to the constitutional issue present in such cases as *Lichter* v. *United States, supra,* and *United States* v. *Pownall,* 65 F. Supp 147 (S.D. Cal. 1946), relied upon by petitioner, as well as *Baltimore Contractors* v. *Renegotiation Board, supra.* Those cases involving retroactive application of the Act are not authority for petitioner's argument that the Renegotiation Act, as applied to Capehart housing contracts, a prospective application, is unconstitutional. We hold the Renegotiation Act as applied to Capehart housing contracts is constitutional. Petitioner, as low bidder, was awarded a contract wherein it agreed the profits would be subject to renegotiation. It took the benefits and it must submit to the agreed-to burden. It is not being deprived of its property without due process by virtue of the application of the Renegotiation Act to its contract.

Petitioner makes one further argument with respect to the constitutional issue. It is that 50 U.S.C.A. sec. 1216(a)(9) (1969 pocket part) of the Renegotiation Act, previously mentioned, which exempts from renegotiation the competitively bid housing contracts, except for Capehart housing contracts, is unconstitutional as creating a classification which is unreasonable, arbitrary, and discriminatory and one that has no relation to the object of the Renegotiation Act.

There is no merit in petitioner's argument. Petitioner cannot argue the Renegotiation clause is to be inserted in all contracts or if it is to be left out of some construction contracts it must be left out of all. Much the same argument was advanced in *United States* v. *Carolene Products Co.,* 304 U.S. 144. In upholding a ban on interstate shipments of "filled" milk but not banning shipments of butter substitutes of the same composition the Court said (p. 151) :

Appellee raises no valid objection to the present statute by arguing that its prohibition has not been extended to oleomargarine or other butter substitutes * * *. The Fifth Amendment has no equal protection clause * * *. A legislature may hit at an abuse which it has found, even though it has failed to strike at another. * * *

One basic distinction between the Capehart housing contracts and other construction contracts is that there is financing by Government-

---

*Finnie Co.* v. *United States,* 31 T.C. 1182 (1959). Renegotiation of 1944 profits of a contract for procurement of shelled, salted, roasted peanuts in 8-ounce cans.

*Ellis Coat Co.* v. *Secretary of War,* 9 T.C. 1004 (1947), Renegotiation of 1942 profits of a contract for manufacture of coats, jungle hammocks, etc.

*W. Tip Davis Co.* v. *Patterson,* 12 T.C. 335 (1949), Renegotiation of 1942 profits of a contract for purchase of desks, files, and chairs.

guaranteed loans in Capehart housing contracts. Evidently Congress thought there was greater danger of realizing excessive profits in that type of contract. Congress does not have to act with complete uniformity in the field of regulatory legislation. *Currin* v. *Wallace*, 306 U.S. 1 (1939); *Wickard* v. *Filburn*, 317 U.S. 111 (1942). The fifth amendment contains no equal protection clause. As stated in *Hirabayashi* v. *United States*, 320 U.S. 81, 100 (1943), the fifth amendment "restrains only such discriminatory legislation by Congress as amounts to a denial of due process * * *. Congress may hit at a particular danger where it is seen, without providing for others which are not so evident or so urgent." It is apparent from the legislative history and the terms of the Act that the classification established by 50 U.S.C.A. sec. 1216(a)(9) (1969 pocket part) was carefully considered by Congress.[4] It is not an arbitrary or unreasonable classification.

We hold petitioner's contract was subject to the Renegotiation Act of 1951 (50 U.S.C. App. sec. 1211, *et seq.*) and not exempt from the Renegotiation Act under 50 U.S.C.A. sec. 1216(a)(9) (1969 pocket part). This means pursuant to the stipulation of the parties, petitioner realized excessive profits in the amount of $1,900,000, less any applicable tax credit, in the fiscal year in issue.

*An order will be issued in accordance herewith.*

---

[4] "SENATOR IVES. Senator Capehart, do you feel this bill is foolproof against windfall profits?

Senator CAPEHART. It is just as foolproof against windfall profits as building tanks, or building airplanes, or building ships or anything else is. You award the contract to the lowest bidder and expect him to make a profit. *But if he makes too much you take it away from him in renegotiation. * * ** Any profit they make they will pay normal taxes on, which at the moment is 52 percent. *In addition they come under the Renegotiation Act. If they do not, they should. We will write it into the bill.* [Emphasis added. Hearings before Subcommittee of the Senate Committee on Banking and Currency, 84th Cong., 1st Sess. p. 52, 53 (1955).]"